COBB, Chief Justice.
B.H.[1] sued Dr. Delane O’Rear and Baptist Health Centers, Inc., Dr. O’Rear’s employer, on October 22, 2001. In his complaint, B.H. alleged negligence, wantonness, medical malpractice, assault,[2] and the tort of outrage against Dr. O’Rear and negligent hiring, training, supervision, and retention against Baptist Health Centers, Inc. The claims against Baptist Health Centers, Inc., were dismissed before trial, as was Dr. O’Rear’s third-party complaint seeking indemnity under his liability policy from his medical-malpractice *110 insurer, Medical Assurance Company. The case was tried before a jury in Walker County on April 14-23, 2009, only on B.H.’s claims against Dr. O’Rear. At the conclusion of the presentation of the evidence, the case was submitted to the jury. The jury found in favor of B.H. and awarded compensatory damages of $1,000,000 and punitive damages of $2,000,000. The trial court entered a judgment on the verdict on April 24, 2009. Dr. O’Rear filed postjudgment motions seeking, alternatively, a judgment as a matter of law, vacation or alteration of the judgment, or a new trial. The post-judgment motions were argued before the trial court on August 11, 2009, and were denied. This appeal ensued.
The trial court’s detailed order denying Dr. O’Rear’s postjudgment motions summarizes much of the evidence presented at the trial. The trial court’s order notes that B.H. had been a patient of Dr. O’Rear’s but that there were factual discrepancies with respect to the time that B.H. had been a patient. The trial court stated:
“To first deal with the undisputed time periods, a jury could find substantial evidence to support the following facts:
“That V. Delane O’Rear was a physician practicing in Walker County, Alabama; that [B.H.] was a patient of the doctor; that Dr. O’Rear prescribed medicine to [B.H.] which included opiate based, and otherwise addictive, medicines; that during that time, Dr. O’Rear engaged in a homosexual relationship with [B.H.]; that [B.H.] expected, and Dr. O’Rear provided, prescriptions in exchange for sex; that during that time, [B.H.] reproduced on a copy machine certain of the prescriptions written by Dr. O’Rear, and upon presenting them at pharmacies, the copies were discovered; that Dr. O’Rear was notified, and [B.H.] was charged with a crime for that act; that having been notified, and being aware of this, Dr. O’Rear continued to treat [B.H.] and continued to write prescriptions for [B.H.] for opiate based medicines; that Dr. O’Rear had [B.H.’s] grandmother pick up prescriptions for [B.H.] at Dr. O’Rear’s office; that on one occasion, Dr. O’Rear personally delivered a prescription to [B.H.’s] grandmother at a residence where she worked, and instructed her not to give the medicine to [B.H.] until [B.H.] was out of the store; that when he now considered the medical records of [B.H.J, they contained what Dr. O’Rear admitted were warning signs of [B.H.’s] drug abuse or addiction; and that in spite of that, Dr. O’Rear continued to treat [B.H.] on until November 3, 1999, at which time [B.H.] recorded their last sexual encounter in Dr. O’Rear’s office and [B.H.] never returned.”
The record supports the trial court’s view of the evidence. We note further that the record indicates that Dr. O’Rear had practiced family medicine in Jasper for over 30 years and that he retired from the practice of medicine in 2003. With respect to Dr. O’Rear’s testimony, the trial court’s order denying the postjudgment motions states:
“Dr. O’Rear identified two versions of the Hippocratic Oath, and the applicable rule from the American Medical Association along with its annotations. He testified unequivocally and without objection that these applied to him and that they established the standard of care applicable to him concerning sexual contact with a patient. These were offered into evidence without objection. The jury could have found without question that these established the applicable standard of care, and that Dr. O’Rear’s conduct, as set out above, violated the *111 standard of care to which he himself had testified he was subject.
[[Image here]]
“[B.H.] examined Dr. O’Rear as to his training, education and experience, and allowed him to identify the Hippocratic Oaths and the American Medical Association Rules. Dr. O’Rear, without objection, testified that those established standards of care to which he was bound. Dr. O’Rear testified that he took the Hippocratic Oath upon graduation from medical school, and that he broke his oath. Again without objection, Dr. O’Rear testified that based upon a hypothetical question from [B.H.], that if the jury believed that he engaged in the conduct substantially set out by the Court in this Order above, that it would be malpractice.... [Tjhere was competent testimony from an expert, not only similarly situated to Dr. O’Rear, but from the doctor himself, as the standard of care applicable and the violation of that standard.”
Again, this Court agrees with the trial court’s summary of the evidence as elicited from Dr. O’Rear.
In addition to Dr. O’Rear’s testimony concerning the medical and ethical standards under which he was obligated to conduct his practice, the trial court’s order denying Dr. O’Rear’s postjudgment motions discusses Dr. O’Rear’s knowledge of B.H.’s dependence on the drugs Dr. O’Rear prescribed.
“Dr. O’Rear finally and reluctantly admitted that in reviewing [B.H.’s] medical records kept by Dr. O’Rear himself that there were telltale signs and warnings of addiction.
“In point of fact, it is undisputed that Dr. O’Rear continued prescribing addictive drugs to [B.H.] after [B.H.] used one of Dr. O’Rear’s prescriptions to make copies on a copy machine to try to obtain more drugs, and went so far as to have [B.H.’s] grandmother pick up the prescriptions rather than putting them in [B.H.’s] hands. For a probation violation on this very charge, [B.H.] was ultimately incarcerated.”
With respect to the evidence that was in dispute, the trial court noted that there was substantial evidence showing that Dr. O’Rear exchanged addictive opiate drugs for sex with B.H. when B.H. was a minor and that he did so under circumstances not associated with Dr. O’Rear’s medical practice, i.e., at locations other than Dr. O’Rear’s office or in Dr. O’Rear’s office but at times when Dr. O’Rear’s medical office was closed. Although the record does contain one emergency-room record from 1991 showing Dr. O’Rear as B.H.’s family physician, Dr. O’Rear testified that no sexual encounters occurred with B.H. during B.H.’s minority, and he offered the absence of any medical records for B.H. for the period from 1992 to 1994, when B.H. was 14 to 16 years old, to confirm that fact. Dr. O’Rear and B.H. both testified as to incidents when B.H. claimed that a prescription Dr. O’Rear had written him had been accidentally lost or destroyed — “the puppy chewed them up” — and both testified that Dr. O’Rear always rewrote those prescriptions. Dr. O’Rear testified that his sexual relationship with B.H. began when B.H. was 20 years old and lasted approximately 18 months. Dr. O’Rear admitted to having approximately 15 to 20 sexual encounters with B.H. during that time. Dr. O’Rear stated that the relationship was consensual.
However, there was also evidence from B.H. and members of his family and various witnesses disputing Dr. O’Rear’s evidence. There was evidence indicating that Dr. O’Rear was the physician for B.H.’s family and that B.H. had a patient-physician relationship with Dr. O’Rear that ex *112 isted from the time B.H. was 11 or 12 years old until B.H. was 21 years old. According to testimony, when B.H. was 13 years old, his mother and stepfather divorced; B.H. was particularly close to his stepfather and suffered emotionally as a result. B.H.’s mother testified that she asked Dr. O’Rear to talk with B.H. about the divorce in an attempt to address B.H.’s distress. B.H. testified that his first sexual encounter with Dr. O’Rear occurred when he was in the eighth grade when, during a physical examination, Dr. O’Rear performed oral sex on B.H. B.H. recalled that after the first encounter Dr. O’Rear told him that this was “their little secret.” B.H. testified that thereafter during visits to Dr. O’Rear’s office, he and Dr. O’Rear would engage in sexual acts, after which Dr. O’Rear would write him á prescription for an addictive drug. B.H. also testified that he would visit Dr. O’Rear’s office after normal business hours when sexual acts would take place between him and Dr. O’Rear. B.H. further testified that sexual contact between the two also occurred at Dr. O’Rear’s residence and at an office where B.H. was employed. According to B.H., he never had a sexual encounter with Dr. O’Rear for which he did not receive a prescription. B.H. testified, “If I wanted a prescription, then I had to perform oral sex or vice versa.”
B.H.’s family testified that before he was 14 years old he was a normal child who did well in school and who was interested in sports. However, his family began to notice changes in his behavior in his 14th year. B.H.’s stepfather testified that he noticed these changes and that as time progressed he began to suspect that B.H. had a drug problem. He also testified that he transported B.H. to Dr. O’Rear’s office for appointments because B.H. was too young to drive. Members of B.H.’s family testified that around this time B.H.’s behavior became more erratic and that he would steal from his mother and other family members and he ceased participating in sports. B.H.’s high school girlfriend, B.N., testified that she often went with B.H. to Dr. O’Rear’s office from the time B.H. was 15 years old until he was 20 and that he never came out of Dr. O’Rear’s office without a prescription. According to the testimony, during this period, B.H.’s behavior continued to deteriorate. When he was 17, B.H. began to share drugs with his half sister, who was 14 at the time. The first drug he shared with his half sister was Tylox, which was in a prescription bottle showing Dr. O’Rear as the prescribing physician. B.H. also shared Xa-nax, Tussionex, and OxyContin with his half sister. B.H. also shared Tylox with B.N. and taught her how to snort Tylox. B.H. became unable to function in school and unable to hold a job.
On April 24, 1998, when B.H. was 20 years old, Dr. O’Rear wrote B.H. prescriptions for Tylox and Xanax. B.H. photocopied the prescriptions and attempted to have them filled at various pharmacies. B.H.’s numerous attempts to have the prescriptions filled failed, and he was subsequently charged and eventually convicted of forging the prescriptions. Dr. O’Rear, as the prescribing physician, was informed of the investigation; he later telephoned B.H. to warn him about the investigation. He also continued to write prescriptions for B.H., and he arranged for different means for B.H. to obtain the drugs. Instead of giving B.H. the prescriptions at his office, Dr. O’Rear would either have B.H.’s grandmother pick them up at his office or he would bring the prescriptions to B.H.’s place of employment. After a few months, however, Dr. O’Rear resumed giving B.H. the prescriptions in his office.
On November 3, 1999, B.H. visited Dr. O’Rear’s office for the last time, and B.H. secretly recorded the visit. The recording, *113 which was introduced into evidence, indicated that B.H. performed fellatio on Dr. O’Rear and that B.H. left the office with a prescription. B.H. also presented extensive evidence and records showing his repeated admissions to rehabilitation clinics. In its order denying Dr. O’Rear’s post-judgment motions, the trial court took judicial notice of the fact that an order was entered in this ease in late 2002 granting Dr. O’Rear immunity from criminal prosecution. The jury was not aware that Dr. O’Rear was immune from criminal sanction.
In his appeal, Dr. O’Rear presents six arguments. First, he argues that all B.H.’s claims are encompassed within the Alabama Medical Liability Act, Ala.Code 1975, § 6-5-480 et seq. and § 6-5-540 et seq. (“the Act”), and are therefore subject to the standards of proof set out in the Act. Second, he asserts that B.H. failed to offer expert testimony as required by the Act with regard to breach of the standard of care and proximate causation. Third, Dr. O’Rear asserts that B.H.’s assault claim is not supported by sufficient evidence to warrant consideration by a jury. Fourth, he argues that the evidence supporting B.H.’s tort-of-outrage claim was insufficient to warrant consideration by the jury. Fifth, Dr. O’Rear argues that a new trial is required because the jury returned a general verdict and, he says, at least one of B.H.’s claims was legally insufficient. And sixth, Dr. O’Rear argues that the $1,000,000 compensatory-damages award is excessive.
I. Standard of Review
Dr. O’Rear challenges the sufficiency of the evidence to support the jury’s verdict, arguing in general that the trial court should have granted his motions for judgment as a matter of law. Our standard of review for addressing a ruling on a motion for a judgment as a matter of law is de novo:
“ ‘ “When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id.” ’ ”
Thompson v. Patton, 6 So.3d 1129, 1133 (Ala.2008)(quoting Leiser v. Raymond R. Fletcher, M.D., P.C., 978 So.2d 700, 705-06 (Ala.2007), quoting in turn Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003)).
The Court has also discussed the standard governing the general review of a judgment based on a jury’s verdict that also encompasses review of the jury’s determination of the weight of the evidence.
*114 “In considering previous appeals challenging a jury’s verdict, this Court has said:
“ ‘Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates the jury’s verdict was wrong and unjust.’
“Campbell v. Burns, 512 So.2d 1341, 1343 (Ala.1987). Moreover, this presumption of correctness is ‘strengthened by the trial court’s denial of the motion for a new trial.’ Friendly Credit Union v. Campbell, 579 So.2d 1288, 1291 (Ala. 1991).”
Williford v. Emerton, 935 So.2d 1150, 1153 (Ala.2004). Further, “ ‘[tjhis Court will not reverse a judgment based on a jury verdict on the ground that the evidence was insufficient unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was “plainly and palpably wrong and unjust.” Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala.1990).’ ” Tolar Constr., LLC v. Kean Elec. Co., 944 So.2d 138, 144-45 (Ala.2006) (quoting Carter v. Henderson, 598 So.2d 1350, 1354 (Ala.1992)).
II. Applicability of the Act
Dr. O’Rear asserts that the following provision from Ala.Code 1975, § 6-5-548(a), governs every aspect of the instant case:
“In any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case.”
Dr. O’Rear bases his argument on his contention that all B.H.’s causes of action arose in connection with Dr. O’Rear’s providing B.H. with medical services. In this context, he relies on Mock v. Allen, 783 So.2d 828 (Ala.2000), in which the Court held that the claims of the plaintiff, Mock, against his doctor, Allen, for sexual assault were governed by the Act. In Mock, Mock alleged that his treating physician touched him improperly during his treatment for various injuries to his head, spine, and hip that resulted from an automobile accident. In Mock, there was no instance of alleged improper touching that did not occur outside the doctor’s office or hospital during a scheduled treatment. Thus, Mock stands for the principle that a sexual assault that occurs during the course of medical treatment is subsumed under the proof requirements of the Act. Similarly, we note that this Court has held that other actions that occur during the course of medical treatment are subsumed under the Act. See, e.g., Mobile Infirmary v. Delchamps, 642 So.2d 954 (Ala.1994) (negligence and breach-of-warranty claims are governed by the Act); Benefield v. F. Hood Craddock Clinic, 456 So.2d 52 (Ala. 1984) (fraud claims subsumed by the Act); and Sellers v. Edwards, 289 Ala. 2, 265 So.2d 438 (1972) (assault and battery governed by the Act). However, in each of these cases, as in Mock, the cause of action arose as a direct result of a particular medical treatment by the defendant medical-service provider. Thus, we agree with Dr. O’Rear that his acts of prescribing medications in return for sexual conduct that occurred while B.H. was being treated *115 by Dr. O’Rear are governed by the proof requirements of the Act.
However, whether all the instances occurred during the course of Dr. O’Rear’s medical treatment was a question of fact for the jury. Thus, if the record contains substantial evidence from which the jury could have inferred that some of B.H.’s claims arose outside the context of a doctor-patient relationship, those claims are not governed by the proof requirements of the Act. The trial court, in its order denying Dr. O’Rear’s postjudgment motions, noted that it was undisputed that some of B.H.’s claims arose out of Dr. O’Rear’s medical treatment of B.H. The trial court also noted evidence of sexual encounters between B.H. and Dr. O’Rear that occurred outside Dr. O’Rear’s practice, either away from Dr. O’Rear’s office or at times when Dr. O’Rear’s medical office was closed. Moreover, the evidence of these sexual encounters was such that the jury could have reasonably concluded that they were purely for the purpose of B.H.’s obtaining drugs to support his addiction and Dr. O’Rear’s using B.H. for sexual gratification without any connection to any course of medical treatment. Further, the trial court noted that Dr. O’Rear himself asserted that there was no doctor-patient relationship during the years from 1992 through 1994 as shown by the absence of medical records of Dr. O’Rear’s office showing that B.H. was treated by Dr. O’Rear. Of course, there was also considerable evidence indicating that B.H. was regularly meeting with Dr. O’Rear during that time and exchanging sex for drugs.
We note, in this regard, that this Court is not permitted to weigh the evidence or to assess the credibility of the witnesses; those functions are for the trier of fact, in this case, the jury.
“Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-mov-ant is to be believed, and all justifiable inferences are to be drawn in his favor. Adickes [v. S.H. Kress & Co.], 398 U.S. [144,] at 158-159 [ (1970) ].”
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). See also Ex parte McInish, 47 So.3d 767 (Ala.2008). The jury was free to believe all or part of the testimony given by any of the witnesses, and, so long as the jury’s determination is supported by substantial evidence and is not plainly wrong, this Court is obligated to adhere to the jury’s determination.
“[T]he law is settled that weighing evidence is not the usual function of an appellate court. Thompson v. Citmoco Servs., Inc., 371 So.2d 42 (Ala.1978). This is especially true where, as here, the assessment of the credibility of witnesses is involved.”
Knight v. Beverly Health Care Bay Manor Health Care Ctr., 820 So.2d 92, 102 (Ala. 2001).
In this case, the evidence shows a course of conduct involving many separate incidents that may have spanned a period as long as eight years. It is plain that some of those incidents took place in the context of Dr. O’Rear’s medical relationship with B.H.; however, there is also evidence, including evidence from Dr. O’Rear himself, that no doctor-patient relationship existed during a time when other evidence supports the conclusion that B.H. was meeting Dr. O’Rear to exchange sex for drugs. Thus, we conclude that the jury could reasonably have determined that some of B.H.’s claims occurred distinct from any doctor-patient relationship, and thus those *116 particular claims are not governed by the proof requirements of the Act.
III. Evidence Showing Breach of Standard of Care Under the Act
Dr. O’Rear asserts that B.H.’s claims that are governed by the proof requirements of the Act must fail because B.H., he says, failed to establish by testimony from a similarly situated health-care provider that Dr. O’Rear breached the applicable standard of care. Bradford v. McGee, 534 So.2d 1076 (Ala.1988). As noted above, Dr. O’Rear himself testified as to the Hippocratic Oath and to the fact that it establishes the appropriate standard for the basic doctor-patient relationship. Moreover, Dr. O’Rear testified as to the application of the Code of Ethics of the American Medical Association and stated that a doctor would violate the standard of care by engaging in a sexual relationship with a patient. Dr. O’Rear argues in this regard that B.H.’s medical-malpractice claim must be limited only to B.H.’s claim that Dr. O’Rear over-prescribed or improperly prescribed medication for B.H. With respect to this argument, Dr. O’Rear asserts that B.H. did not state a standard of care with respect to the improper prescription of medications. Our review of the complaint in this regard shows numerous references to claims of sexual assault, sometimes also referencing the improper prescription of medications to facilitate that assault. Accordingly, we conclude that B.H. did adequately state claims of medical malpractice arising from Dr. O’Rear’s sexual misconduct and that Dr. O’Rear provided ample evidence of the appropriate standard of care and the breach of that standard.
With respect to the claim that Dr. O’Rear committed medical malpractice by improperly prescribing addictive drugs, Dr. O’Rear also testified that it would be a violation of the standard of care to prescribe opiate-based addictive medicine to any patient he knew to have an addiction problem unless the medicine was prescribed as a treatment intervention for that problem. Thus, as with the claim based on sexual assault, Dr. O’Rear himself has provided expert testimony as to the appropriate standard of care. As an aside, we note that the record contains ample evidence showing that Dr. O’Rear knew or should have known that B.H. was addicted to the medications he was prescribing and that Dr. O’Rear was aware that B.H. was subject to criminal penalties as a result of his attempts to satisfy B.H.’s addiction even while Dr. O’Rear continued to issue more prescriptions. Dr. O’Rear himself admitted that B.H.’s medical record from his office did show signs of a drug-abuse problem. There is also considerable evidence in the record indicating that in his physical appearance and demeanor B.H. showed signs of a drug-abuse problem that would be apparent even to a person without medical training.
Dr. O’Rear further argues that B.H. failed to present sufficient evidence showing that his wrongful acts resulted in injury to B.H. as required by the Act. See also Lyons v. Vaughan Reg’l Med. Ctr., LLC, 28 So.3d 23, 28-29 (Ala.2009) (“To have a valid claim under the Alabama Medical Liability Act, the [plaintiffs] must provide evidence indicating that the negligence alleged is the proximate and probable cause of [the patient’s] injury; a mere possibility or one possibility among others is insufficient to meet the burden of proof.”). In this case, Dr. O’Rear, himself, admitted that he was aware that B.H. was displaying signs of drug addiction; that is, Dr. O’Rear testified that he understood that B.H. had become dependent on the medications Dr. O’Rear was prescribing. Further, there was extensive evidence be *117 fore the jury indicating that B.H.’s drug addiction directly resulted in B.H.’s failures at school and in his personal life, as well as his eventual incarceration on criminal charges. Under the circumstances of this case, the damage caused by B.H.’s addiction to the drugs being prescribed by Dr. O’Rear is apparent to an ordinary layman; it was also within the province of the jury to determine that Dr. O’Rear’s actions caused B.H.’s addiction even though B.H. later may have sought to satisfy that addiction from other sources. Anderson, supra. Moreover, as will be discussed in more depth later in this opinion, this Court will presume that a sexual assault on a minor results in profound damage to that minor. We find no merit in Dr. O’Rear’s argument on this point.
IV. The Assault Claim
Dr. O’Rear asserts that B.H. failed to offer sufficient evidence to support his claim of assault. In support of this argument, he relies on Wright v. Wright, 654 So.2d 542 (Ala.1995), which defines assault as follows:
“ ‘ “[A]n intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.” ’
“Allen v. Walker, 569 So.2d 350, 351 (Ala.1990), quoting Western Union Telegraph Co. v. Hill, 25 Ala.App. 540, 542, 150 So. 709, 710, cert. denied, 227 Ala. 469, 150 So. 711 (1933), as quoted in Holcombe v. Whitaker, 294 Ala. 430, 435, 318 So.2d 289, 294 (1975). A successful assault becomes a battery, which consists of the touching of another in a hostile manner. Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala.1986), citing Singer Sewing Machine Co. v. Methvin, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).”
654 So.2d at 544. Dr. O’Rear asserts that because his touching of B.H. was consensual, there was no proof of assault.
In this case, the record contains ample evidence from which the jury could have concluded that Dr. O’Rear’s sexual conduct with B.H. began when B.H. was a minor, perhaps as young as 11 or 12 years old; there is also evidence from which the jury could have inferred that Dr. O’Rear’s sexual advances were made when B.H.’s judgment was affected by the drug abuse fostered by Dr. O’Rear. In the case of State Farm Fire & Casualty Co. v. Davis, 612 So.2d 458 (Ala.1993), this Court addressed a certified question from the United States District Court for the Middle District of Alabama and concluded that when an adult subjects a minor to sexual advances the intent to cause harm is inferred from the fact that the adult has initiated the sexual contact. The Court stated:
“The basis for our holding is illustrated by the words of a Florida justice:
“ T am absolutely unwilling to deny the foreseeability of injury to a child who is subjected to sexual abuse. It defies human response and sensitivity to conclude that the inevitable product of the sexual molestation of a child is not intended. That conduct inescapably inspires some response in the minor victim. Whether the response is a precocious excitation of libido, an utter revulsion or simply confusion, the child suffers grave psychological injury. Indeed, the fact that the ultimate goal of this litigation is to acquire funding to reconstruct [the child’s] emotional status is a testament to the soundness of my urging that we not afford slavish adherence *118 to a principle [subjective intent to harm] that simply does not fit the context. The damage [the child] suffered flowed just as surely from [the insured’s] criminal acts as if he had taken his fist or club and struck her in the face.’
“Zordan v. Page, 500 So.2d 608, 613 (Fla.Dist.Ct.App.1986), review denied, 508 So.2d 15 (Fla.1987) (Frank, J., dissenting).”
612 So.2d at 465. The application of this legal principle to the circumstances of this case is that sexual advances made on a minor child are presumed to be without consent and are presumed to result in profound damage. See also Powe v. State, 597 So.2d 721 (Ala.1991) (upholding a father’s conviction for the rape of his 11-year-old daughter even in the absence of any physical force and with evidence indicating that she did not resist the assault, i.e., consent was not a factor in the crime), and Bennett v. State, 57 Ala.App. 568, 329 So.2d 627 (Ala.Crim.App.1976) (noting that a man who takes “improper liberties” with the person of a female without her consent is guilty of assault and battery). We conclude that B.H. presented evidence, which, if believed by the jury, was sufficient to support his claims of assault, both within the context of the Act and within the tort laws of this State.
V. The Tort-of-Outrage Claim
Dr. O’Rear also argues that B.H.’s tort-of-outrage claim was not supported by the evidence. Concerning the tort of outrage, this Court has held:
“The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, Whitt v. Hulsey, 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, National Sec. Fire & Cas. Co. v. Bowen, 447 So.2d 133 (Ala.1983); and (3) egregious sexual harassment, Busby v. Truswal Sys. Corp., 551 So.2d 322 (Ala. 1989). See also Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed.1996). In order to recover, a plaintiff must demonstrate that the defendant’s conduct ‘(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.’ Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38, 44 (Ala.1990) (citing American Road Service Co. v. Inmon [, 394 So.2d 361 (Ala.1980) ]).”
Potts v. Hayes, 771 So.2d 462, 465 (Ala. 2000). Both this Court and the Alabama Court of Civil Appeals have previously addressed whether a sexual relationship between a medical or psychological professional and a patient constituted the tort of outrage. In Perkins v. Dean, 570 So.2d 1217 (Ala.1990), the Court held that consensual sexual relations between a patient and social worker did not rise to the level of outrage. In Gunter v. Huddle, 724 So.2d 544 (Ala.Civ.App.1998), the court held that a consensual relationship between an physician and his patient did not support a tort-of-outrage claim.
The evidence in this case discloses conduct that goes considerably further than the conduct discussed in Perkins and Gun-ter. The trial court summarized the evidence concerning B.H.’s tort-of-outrage claim as follows:
“That [B.H.’s] family used Dr. O’Rear as a family doctor; that [B.H.] was very close to his stepfather ... and [B.H.’s] mother encountered marital difficulties at a time when the [B.H.] was in his early teens; that [B.H.’s] mother asked Dr. O’Rear to counsel with [B.H.] con *119 cerning his stress over the marital discord; that in response to that, instead of attempting to help [B.H.] with his difficulties, that Dr. O’Rear embarked on a deliberate course of conduct to take advantage of a very young man’s emotional weakness, and dependence upon a figure to whom he had been taught to have confidence in; that Dr. O’Rear began to exchange drugs for homosexual sex with a minor; that the relationship continued on, in the context of the doctor/patient relationship, and outside the doctor/patient relationship, for many years, up until 1999; that in the course of that, Dr. O’Rear introduced [B.H.] to addictive opiate based drugs; and that Dr. O’Rear continued to provide access to those drugs even after it would have been apparent to even a casual observer that [B.H.] had developed a drug dependence.”
The record supports the trial court’s recitation of the facts. We also note that the trial court had the same opportunity to observe the witnesses as did the jury, and it presented the above-quoted language in its order denying Dr. O’Rear’s post-judgment motions, thus strengthening the presumption of correctness to be afforded the jury’s verdict.[3] Williford, supra, and Friendly Credit Union v. Campbell, 579 So.2d 1288 (Ala.1991). The trial court stated that if the jury believed the facts as stated above, then Dr. O’Rear’s conduct would be so outside the bounds of human decency as to shock the conscience. For our part, we conclude that the jury had evidence to support the conclusions that Dr. O’Rear’s conduct toward B.H. began when B.H. was a minor and that it was intentional and for Dr. O’Rear’s sexual gratification, that Dr. O’Rear’s conduct took place both within and outside the doctor-patient relationship, and that his conduct in fostering B.H.’s drug dependence in conjunction with his sexual misconduct toward a minor was extreme and outrageous and caused B.H. severe distress and profoundly impaired B.H.’s ability to live a normal life. Accordingly, we conclude that B.H.’s tort-of-outrage claim, both in the context of the Act and outside it, was properly supported by substantial evidence.[4] Williford and Friendly Credit Union, supra.
VI. The Compensatory-Damages Award
Dr. O’Rear also argues that the jury’s award of compensatory damages in this case was excessive and unsupported by the evidence. This argument was also presented to the trial court in Dr. O’Rear’s motion for postjudgment relief, and, in ruling on the motion, that court simply stated: “[T]here was more than substantial evidence to indicate that [B.H.] suffered mightily and over a long period of time, and that further, he may continue to suffer for the rest of his life for what the jury could have found to have been visited on him by [Dr. O’Rear].” After conducting a hearing pursuant to the guidelines set out *120 in this Court’s decisions in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), the trial court denied Dr. O’Rear’s motion.
The applicable standard for the appellate review of a jury’s damages award defers to the discretion of the jury:
“ ‘This Court has long held that “[t]here is no fixed standard for ascertainment of compensatory damages recoverable ... for physical pain and mental suffering” and that “the amount of such [an] award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise of that discretion.” Alabama Power Co. v. Mosley, 294 Ala. 394, 401, 318 So.2d 260, 266 (1975). This Court has consistently held that a trial court cannot interfere with a jury verdict merely because it believes the jury gave too little or too much. Williston v. Ard, 611 So.2d 274 (Ala. 1992); Olympia Spa v. Johnson, 547 So.2d 80 (Ala.1989); and Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (Ala.1963).’ ”
Black v. Comer, 38 So.3d 16, 27 (Ala.2009) (quoting Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1044 (Ala.1999)). Dr. O’Rear’s argument to this Court relies on the legal standard for the review of compensatory-damages awards set out in Southern Pine Electric Cooperative v. Burch, 878 So.2d 1120, 1127 (Ala.2003):
“ ‘There is no' fixed standard for determining the amount of compensatory damages a jury may award for mental anguish. The amount of the damages award is left to the jury’s sound discretion, subject only to review by the court for a clear abuse of that discretion.’ Delchamps, Inc. v. Bryant, 738 So.2d 824, 837 (Ala.1999). However, where the plaintiff suffers no physical injury and ‘offer[s] little or no direct evidence concerning the mental suffering sustained as a result of the defendant’s wrongdoing,’ we give stricter scrutiny to an award for mental distress. National Ins. Ass’n v. Sockwell, 829 So.2d 111, 133 (Ala.2002). See Kmart Corp. v. Kyles, 723 So.2d 572 (Ala.1998). The plaintiffs testimony is direct evidence of mental anguish. 723 So.2d at 578. Thus, where the plaintiff has suffered no physical injury, we ‘address the strength of the presumption that a jury’s verdict is correct,’ Bryant, 738 So.2d at 837, in the context of the plaintiffs testimony regarding the ‘nature, severity, and duration of the mental anguish.’ Alabama Power Co. v. Murray, 751 So.2d 494, 501 (Ala.1999). Cf. Orkin Exterminating Co. v. Jeter, 832 So.2d 25 (Ala.2001) (remitting $400,000 compensatory-damages award to $300,000); Oliver v. Towns, 770 So.2d 1059 (Ala.2000) ($500,-000 compensatory-damages award remitted to $75,000); Alabama Power Co. v. Murray, supra ($150,000 compensatory-damages award reduced to $84,000); Bryant, supra (reducing $400,000 compensatory-damages award to $100,000); Kyles, supra ($100,000 compensatory-damages award remitted to $15,000).”
Dr. O’Rear’s argument that the compensatory-damages award is excessive rests largely on his contention that the harm suffered by B.H. was solely emotional and mental and that B.H. presented no evidence of any physical injury. Thus, Dr. O’Rear asserts that, although the jury had evidence to support a conclusion that he caused B.H.’s addiction to narcotic drugs that in turn caused B.H. emotional distress, there is also evidence in the record indicating that B.H. sought drugs from other sources so that his emotional distress resulting from Dr. O’Rear’s actions should not be sufficient to support a compensatory-damages award of $1,000,000. *121 Dr. O’Rear’s argument entirely disregards the emotional trauma and harm that is presumed when an adult sexually assaults a minor. Davis, supra. Dr. O’Rear’s argument also disregards the evidence indicating that B.H.’s addiction has resulted in the loss of various educational opportunities during his teenage years, has required him to undergo several attempts at drug-abuse rehabilitation (a costly process that results in extreme physical discomfort), and has resulted in a criminal conviction and incarceration. We recognize that the consequences of a criminal conviction include significant actual harm, such as the loss of opportunity to attend various educational institutions, the loss of the opportunity to pursue various careers, and the loss of various civil rights, possibly including the right to vote in state or federal elections. See, e.g., Ala. Const. 1901, Art. VIII, § 177; Ala.Code 1975, § 12-16-60(a); and Ala.Code 1975, § 36-2-l(a)(3). We conclude that the trial court did not err in holding that in setting the compensatory-damages award the jury did not exceed its discretion.
Accordingly, the judgment is due to be affirmed.
AFFIRMED.
WOODALL, STUART, PARKER, MAIN, and WISE, JJ., concur.
BOLIN, MURDOCK, and SHAW, JJ., concur in the result.

. Because the appellee in this case was the victim of a sexual assault, we have used initials to protect his anonymity. See Rule 52, Ala. R.App. P.

. Although the complaint alleged only assault, the trial court charged the jury on assault and battery.

. The trial court’s order denying the post-judgment motions states: "The Court observed [B.H.’s] witnesses and found them to be credible and to be endeavoring to tell the truth to the best of their respective recollections. Dr. O’Rear made many concessions in his testimony that could only lead to the conclusion that he did the things he did with a reckless indifference to the consequences, if not knowing full well the consequences.”

. Dr. O’Rear also argues that he is entitled to a new trial under Alfa Life Insurance Corp. v. Jackson, 906 So.2d 143 (Ala.2005) (holding that a general verdict cannot stand if one of the claims submitted to the jury was a "bad count,” i.e., unsupported by the evidence). The jury here returned a general verdict. Because, however, we have determined that none of the claims submitted to the jury were unsupported by the evidence, we do not address this argument further.