MAIN, Justice.
Altapointe Health Systems, Inc., and Altapointe Healthcare Management, LLC (hereinafter referred to collectively as "Altapointe"), petition for a writ of mandamus directing the Mobile Circuit Court to vacate its order compelling Altapointe to respond to certain discovery requests and to enter a protective order in its favor in an action pending against it. We grant the petition in part and deny it in part.
I. Facts and Procedural History
On March 13, 2016, Jim Avnet, as father and next friend of Hunter Avnet, sued Altapointe Health Systems, Inc., and Altapointe Healthcare Management, LLC, in the Mobile Circuit Court. Altapointe operates group homes for adults suffering from mental illness. Avnet asserted that Hunter, a resident at one of Altapointe's group homes, was assaulted by another resident, Kerdeus Crenshaw. Avnet alleged that Hunter was attacked by Crenshaw with a blunt object and was stabbed numerous times in the head with a kitchen knife.
*1111 Hunter sustained serious injuries as a result of the attack. Avnet asserted various claims of negligence and wantonness against Altapointe, including claims that Altapointe failed to comply with various unspecified regulations and guidelines designed to protect Hunter's safety and that Altapointe was negligent or wanton in hiring, training, and supervising its employees.
Along with his complaint, Avnet served Altapointe with written discovery requests. Avnet's discovery requests sought the total amount of Altapointe's liability-insurance coverage limits; information regarding prior claims or lawsuits against Altapointe alleging personal injury or assault at the home; information concerning whether Altapointe was aware of any previous "aggressive acts" by Crenshaw; and information and documents regarding Altapointe's own investigation of the incident.
Altapointe objected to Avnet's discovery requests, contending that the information and documents requested were protected by certain discovery privileges. With regard to the request for its insurance limits and information regarding prior claims, Altapointe contended that the discovery was barred by provisions of the Alabama Medical Liability Act, § 6-5-480 et seq., Ala. Code 1975, and § 6-5-540 et seq., Ala. Code 1975 ("the AMLA")-specifically, § 6-5-548(d), Ala. Code 1975, and § 6-5-551, Ala. Code 1975. Section 6-5-548(d) bars discovery of "[t]he limits of liability insurance coverage available to a health care provider." Section 6-5-551 prohibits a party from conducting discovery "with regard to any other act or omission." With regard to the interrogatory as to whether Altapointe had knowledge of prior "aggressive acts" by Crenshaw, Altapointe contended that it could not respond to the interrogatory without violating the psychotherapist-patient privilege. See § 34-26-2, Ala. Code 1975; Rule 503, Ala. R. Evid. Finally, Altapointe argued that discovery of information and documents related to Altapointe's own investigation into the incident was precluded by the quality-assurance privilege of § 22-21-8, Ala. Code 1975.
Avnet then moved to compel production of the discovery objected to by Altapointe. Altapointe opposed the motion to compel and moved for a protective order. On March 21, 2017, following a hearing, the trial court entered an order granting Avnet's motion to compel and denying Altapointe's motion for a protective order. The trial court ordered Altapointe to provide the requested discovery within 10 days of the order. This petition followed.
II. Standard of Review
" 'Mandamus is an extraordinary remedy and will be granted only when there is "(1) a clear legal right in the petitioner to the order sought, (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so, (3) the lack of another adequate remedy, and (4) properly invoked jurisdiction of the court." Ex parte Alfab, Inc., 586 So.2d 889, 891 (Ala. 1991). In Ex parte Ocwen Federal Bank, FSB, 872 So.2d 810 (Ala. 2003), this Court announced that it would no longer review discovery orders pursuant to extraordinary writs. However, we did identify four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus. Such circumstances arise (a) when a privilege is disregarded, see Ex parte Miltope Corp., 823 So.2d 640, 644-45 (Ala. 2001).... The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case-that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'g Co., 601 So.2d 423, 426 (Ala. 1992).'
" Ex parte Dillard Dep't Stores, Inc., 879 So.2d 1134, 1136-37 (Ala. 2003)."
*1112 Ex parte Fairfield Nursing & Rehabilitation Ctr., L.L.C., 22 So.3d 445, 447 (Ala. 2009).
III. Analysis
Altapointe first contends that the trial court erred in compelling discovery relating to Altapointe's liability-insurance coverage limits and prior claims. Specifically, it argues that information is protected from discovery by two provisions of the AMLA. Section 6-5-548(d) bars discovery of "[t]he limits of liability insurance coverage available to a health care provider," and § 6-5-551 bars discovery "with regard to any other act or omission." To determine whether those provisions preclude the discovery sought, we must make a threshold determination as to whether Avnet's claims fall under the AMLA.
The AMLA applies "[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." § 6-5-548(a), Ala. Code 1975. There is no dispute that Altapointe is a "health-care provider" as that term is defined by the AMLA. Nevertheless, the AMLA does not apply to all claims against health-care providers arising out of the relationship between the health-care provider and the patient. Ex parte Addiction & Mental Health Servs., Inc., 948 So.2d 533 (Ala. 2006).
" '[T]he [AMLA] applies "only to medical-malpractice actions," Mock v. Allen, 783 So.2d 828, 832 (Ala. 2000), "in the context of patient-doctor and patient-hospital relationships." Thomasson [v. Diethelm], 457 So.2d [397,] 399 [ (Ala. 1984) ]. By definition, a "medical-malpractice action" is one for redress of a "medical injury." See 6-5-540 (purpose of the [AMLA] is to regulate actions for "alleged medical injury") (emphasis added [in Taylor ] ); see also Ala. Code 1975, § 6-5-549.1 (same).' "
Addiction & Mental Health Servs., 948 So.2d at 535 (quoting Taylor v. Smith, 892 So.2d 887, 893 (Ala. 2004) ).
Recently, in Ex parte Vanderwall, 201 So.3d 525, 537 (Ala. 2015), this Court reviewed a case in which a physical therapist was alleged to have sexually assaulted a patient by inappropriately touching the patient's genitals and breasts during a physical-therapy appointment. It was undisputed that there was no therapeutic or medical reason for the therapist to have touched the patient in such a manner. In Vanderwall, this Court explored the text and interpretative history of the AMLA and concluded that the AMLA was not applicable to the claim and, thus, did not provide the physical therapist relief from discovery of information relating to other acts or omissions on the part of the physical therapist. In reaching this conclusion we overruled the "place and time" rule previously applied this Court.[1] We concluded: "[I]t is clear that the AMLA is not just concerned with who committed the alleged wrongful conduct or when and where that conduct occurred, but also with *1113 whether the harm occurred because of the provision of medical services." 201 So.3d at 537-38.
In this case, Hunter is alleged to have suffered a violent and unprovoked attack by a fellow resident of the group home in which he lived. The gravamen of Avnet's complaint is that Altapointe negligently and wantonly failed to safeguard Hunter from such an attack. There are no express allegations of medical negligence. Rather, Altapointe's contention that the AMLA applies to Avnet's claims relies solely on the fact that the attack occurred in its facility. Altapointe summarizes its argument as follows:
"Hunter Avnet's mental illness prevented him from being able to independently live and care for himself, hence his residency at [the group home]. The attack on Hunter Avnet occurred during his residency. Thus, Hunter Avnet's injuries, and subsequent legal claims, arose out the rendition of healthcare services."
(Altapointe's petition, at 13.) Altapointe's contention, however, merely applies the discredited "time and place" argument to the facts of this case; it has submitted no actual evidence linking the violent assault on Hunter to his medical care. Because there is no evidence before us that would permit us to conclude that the assault on Hunter was somehow linked to the administration of medical care or professional services by Altapointe, we cannot say that the AMLA applies to Avnet's claims. Accordingly, Altapointe has not established a clear legal right to an order limiting discovery under the above provisions of the AMLA.
Next, we turn to the Altapointe's contention that it was entitled to a protective order from the discovery sought related to any prior aggressive acts by Crenshaw on the basis of the psychotherapist-patient privilege. In his written discovery request to Altapointe, Avnet propounded the following interrogatory:
"Prior to the incident made the basis of this lawsuit, were the Defendants aware of any prior aggressive acts of K[e]rdeus Crenshaw based on any reports, incarcerations, arrests, convictions, treatments, or other similar incidences at any location?"
Altapointe objected to this interrogatory on the ground that to answer it would violate the psychotherapist-patient privilege. In essence, Altapointe argues that, because all of its knowledge of Crenshaw stems from the patient-provider relationship, answering Avnet's interrogatory would necessarily violate the psychotherapist-patient privilege. This argument, however, is based on an overbroad definition of the privilege.
The psychotherapist-patient privilege is intended to protect confidential relations and communications between a patient and his or her psychotherapist. We have described the privilege and its underlying public policy as follows:
"The psychotherapist-patient privilege, as adopted by the legislature, provides, in pertinent part, that 'the confidential relations and communications between licensed psychologists, licensed psychiatrists, or licensed psychological technicians and their clients are placed upon the same basis as those provided by law between attorney and client, and nothing in this chapter shall be construed to require any such privileged communication to be disclosed.' Ala. Code 1975, § 34-26-2. Rule 503, Ala. R. Evid., 'Psychotherapist-Patient Privilege,' provides further explication of this privilege, providing, in pertinent part:
" '(b) General Rule of Privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications, *1114 made for the purposes of diagnosis or treatment of the patient's mental or emotional condition, including alcohol or drug addiction, among the patient, the patient's psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.
" '(c) Who May Claim the Privilege. The privilege may be claimed by the patient, the patient's guardian or conservator, or the personal representative of a deceased patient. The person who was the psychotherapist at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient.
" '....'
"....
" 'The strength of the public policy on which the statutory psychotherapist-patient privilege is based has been well recognized by this Court. It follows that the privilege is not easily outweighed by competing interests.' Ex parte United Serv. Stations, Inc., 628 So.2d 501, 504 (Ala. 1993). The Court has explained the public policy that supports the privilege as follows:
" 'Statutes such as § 34-26-2 are intended to inspire confidence in the patient and encourage him in making a full disclosure to the physician as to his symptoms and condition, by preventing the physician from making public information that would result in humiliation, embarrassment, or disgrace to the patient, and are thus designed to promote the efficacy of the physician's advice or treatment. The exclusion of the evidence rests in the public policy and is for the general interest of the community. See 81 Am. Jur. 2d Witnesses § 231 at 262 (1976) ; Annot., 44 A.L.R.3d 24 Privilege, in Judicial or Quasi-judicial Proceedings, Arising from Relationship Between Psychiatrist or Psychologist and Patient (1972).
" ' "[A] psychiatrist must have his patient's confidence or he cannot help him. 'The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. ... It would be too much to expect them to do so if they knew that all they say-and all that the psychiatrist learns from what they say-may be revealed to the whole world from a witness stand.' "
" ' Taylor v. United States, 222 F.2d 398, 401 (D.C. Cir. 1955), quoting Guttmacher and Weihofen, Psychiatry and The Law (1952), p. 272.'
" Ex parte Rudder, 507 So.2d 411, 413 (Ala. 1987)." Ex parte Northwest Alabama Mental Health Ctr., 68 So.3d 792, 796-97 (Ala. 2011).
Unlike Northwest Alabama Mental Health Center, in which the plaintiff sought production of all of a patient's mental-health records, Avnet's request in this case is much narrower.[2] Avnet seeks to know whether Altapointe had knowledge *1115 of any prior "aggressive" actions by Crenshaw. It is, of course, possible that Altapointe has knowledge of such actions acquired through confidential communications with Crenshaw made during the course of Crenshaw's treatment or diagnosis. In that case, such knowledge would be protected by the psychotherapist-patient privilege. But it is also possible that Altapointe had knowledge of prior incidents of violence or aggression that it did not acquire in confidence.
Rule 503, Ala. R. Evid., defines a "confidential communication" for the purposes of the psychotherapist-patient privilege as follows:
"A communication is 'confidential' if not intended to be disclosed to third persons other than those present to further the interest of the patient in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the psychotherapist, including members of the patient's family."
Thus, by definition, a patient's interactions with a third party (other than those described by the rule) are not a "confidential communications" with a psychotherapist. Thus, it follows that a mental-health provider's independent knowledge of a patient's assault on a third party cannot be considered as resulting from a confidential communication protected by the psychotherapist-patient privilege. By way of example, Altapointe presumably knows of Crenshaw's assault of Hunter because it happened in its facility to one of its residents, and not because (or at least not solely because) it was confidentially relayed to Altapointe by Crenshaw in the course of his treatment. Thus, its knowledge of that event is not the result of a protected confidential communication. Likewise, if Altapointe has knowledge of other such incidents it learned of outside of its confidential comminations and relations with Crenshaw, its knowledge of such incidents is discoverable.
Thus, based on the above, we reject Altapointe's blanket contention that all information within its knowledge pertaining to Crenshaw is protected by the psychotherapist-patient privilege. Whether any particular information responsive to Avnet's interrogatory concerning Crenshaw is protected by the psychotherapist-patient privilege is an issue that may be further addressed by the trial court upon a properly supported motion for a protective order. Based on the materials and arguments now before this Court, however, Altapointe has not established a clear legal right to relief from Avnet's discovery under the psychotherapist-patient privilege.
Finally, Altapointe argues that the incident reports it prepared in the wake of the Crenshaw's assault on Hunter are "quality-assurance" materials protected from disclosure by § 22-21-8.[3] Section 22-21-8 provides, in part:
"(a) Accreditation, quality assurance and similar materials as used in this section shall include written reports, records, correspondence, and materials concerning the accreditation or quality assurance or similar function of any hospital, clinic, or medical staff. The confidentiality established by this section shall apply to materials prepared by an employee, advisor, or consultant of a hospital, clinic, or medical staff and to materials prepared by an employee, advisor or consultant of an accrediting, quality assurance or similar agency or *1116 similar body and to any individual who is an employee, advisor or consultant of a hospital, clinic, medical staff or accrediting, quality assurance or similar agency or body.
"(b) All accreditation, quality assurance credentialling and similar materials shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care professional or institution arising out of matters which are the subject of evaluation and review for accreditation, quality assurance and similar function, purposes, or activities. No person involved in preparation, evaluation or review of accreditation, quality assurance or similar materials shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented during the course of preparation, evaluation, or review of such materials or as to any finding, recommendation, evaluation, opinion, or other action of such accreditation, quality assurance or similar function or other person involved therein. ..."
This Court has given § 22-21-8 a broad interpretation.[4] See, e.g., Fairfield Nursing, 22 So.3d at 452 (noting that the language of § 22-21-8 does not require the existence of a quality-assurance committee or limit the privilege to materials created by such a committee); Ex parte Krothapalli, 762 So.2d 836, 839 (Ala. 2000) (noting the "broad language used by the Legislature" in the title to the act that became § 22-21-8 ). Nevertheless, the party asserting the quality-assurance privilege has the burden of proving its applicability as well as the prejudicial effect of disclosing the information in question. Ex parte Coosa Valley Health Care, Inc., 789 So.2d 208, 219 (Ala. 2000) (noting that, with regard to § 22-21-8, "the burden of proving that a privilege exists and proving the prejudicial effect of disclosing the information is on the party asserting the privilege").
In Fairfield Nursing, a long-term-care facility sought mandamus relief from an order compelling production of incident reports related to the alleged wrongful death of a patient. In support of its assertion of the quality-assurance privilege, the facility offered two identically worded affidavits from its executive director and director of nursing, which stated:
" 'Incident reports and witness statements concerning residents are not kept in the ordinary course of business, nor do they become a part of the resident medical chart. ... Incident reports and witness statements are created for quality assurance purposes. The creation of the reports and the gathering of statements are needed to guarantee the high quality of care for all residents. ... The confidentiality of the incident reports and witness statements is needed to keep investigations of incidents at the facility candid and open. Production of incident reports and witness statements to those outside the facility would be detrimental to the quality of care provided for all residents.' "
22 So.3d at 448. We held in Fairfield Nursing that this evidence was sufficient to support application of the quality-assurance privilege.
In Ex parte Qureshi, 768 So.2d 374 (Ala. 2000), a patient sued her doctor and the hospital at which the doctor was credentialed alleging medical malpractice. The patient sought discovery from the hospital concerning the doctor's qualifications. The hospital objected to the discovery under § 22-21-8 and provided an affidavit from the chairman of its credentialing committee.
*1117 The chairman testified that the documents responsive to the discovery request were part of the hospital's credentialing file on the doctor; that it was essential that the materials gathered by the hospital be kept confidential, so as to ensure that physicians applying for hospital staff privileges would provide complete and accurate information about their qualifications; and that if the materials were not kept confidential, " 'physicians and health care institutions from whom materials are requested in the credentialing process would be less inclined to provide frank and open criticisms of physician applicants where warranted.' " 768 So.2d at 376. Based on this evidence, we held that the trial court erred in compelling production of the responsive documents.
In this case, Altapointe submitted the affidavit of Sherill Alexander, a registered nurse employed as Altapointe's corporate compliance officer, to support its claim of a quality-assurance privilege.[5] Alexander testified:
"3. In the aftermath of the unexpected attack on Mr. Avnet, Altapointe, through its Performance Improvement Committee, of which I am a member, directed a group of employees to investigate the incident to determine the factors that caused the incident, and whether adequate safeguards were in place or whether there needs to be additional safeguards implemented or put into place to prevent future incidents from reoccurring. As a result of the investigation, we generated a 'Confidential Incident Report.'
"4. The process of the investigation, the interviews conducted and the interview reports/summaries, and the 'Confidential Incident Report' itself were made for the purpose of quality assurance.
"5. The investigation process, the interviews and interview summaries, and the Incident report are created to guarantee the high quality of care for all patients/consumers.
"6. Confidentiality is essential to ensure that we gather complete and accurate information.
"7. These documents do not become part of the consumers'/patients' medical chart, and are used solely for the purposes of quality assurance and improvement."
This testimony is precisely the type of evidence we have previously held to be sufficient to establish the existence of the quality-assurance privilege. Accordingly, we hold that Altapointe sufficiently established the application of the privilege. Thus, the incident reports and related documents created by Altapointe's Performance Improvement Committee in response to the incident are not subject to discovery pursuant to § 22-21-8.
V. Conclusion
Altapointe has offered sufficient evidence demonstrating that it is entitled to the quality-assurance privilege provided in § 22-21-8 as to Avnet's request for information and documents relating to Altapointe's own investigation of the incident. Accordingly, the petition for writ of mandamus is granted as to that request. As to the remaining requests, however, Altapointe has not sufficiently established that the discovery protections of the AMLA or *1118 the psychotherapist-patient privilege apply. Thus, as to those requests, the petition is denied.
PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
Bolin, Parker, and Wise, JJ., concur.
Bryan, J., concurs in the result.
Shaw and Sellers, JJ., concur in part and dissent in part.
Murdock, J., concurs in part, concurs in the result in part, and dissents in part.
Stuart, C.J., recuses herself.

In Vanderwall, we reasoned:
"Vanderwall has asked us to apply an interpretation of the AMLA from cases that exalt a broad reading of the statute over the plain text. Mock [v. Allen, 783 So.2d 828 (Ala. 2000),] and O'Rear [v. B.H., 69 So.3d 106 (Ala. 2011),] posit that the legislature intended the AMLA to apply to any action in which the alleged injury was inflicted by a medical provider at the same place and time as medical treatment, rather than applying only to actions in which the alleged injury occurred because of medical treatment. ... We do not believe the legislature intended for the protections afforded under the AMLA to apply to health-care providers who are alleged to have committed acts of sexual assault; such acts do not, by any ordinary understanding, come within the ambit of 'medical treatment' or 'providing professional services.' "
201 So.3d at 536-37.

Before Altapointe filed this petition, Avnet formally withdrew his request for production of Altapointe's file on Crenshaw and informed counsel for Altapointe in writing that he did not seek Crenshaw's medical records and did not consider such records responsive to any of his discovery requests.

We note that § 22-21-8 is a statute generally applicable to hospitals and health-care facilities and is not a part of the AMLA.

Avnet has not asked this Court to revisit its interpretation of § 22-21-8.

Avnet contends that the affidavit was untimely under Rule 6(d), Ala. R. Civ. P., because it was submitted the night before the hearing on Avnet's motion to compel and Altapointe's motion for a protective order. Nothing in the petition or attachments, however, indicates that Avnet objected to the affidavit or that the trial court excluded the affidavit. Thus, we presume that the trial court considered Alexander's affidavit. See Ex parte McKenzie, 37 So.3d 128, 131 n.1 (Ala. 2009).