783 So.2d 828 (2000)
Shellie MOCK, Jr.
v.
Dr. Robert ALLEN.
1980985.
Supreme Court of Alabama.
November 17, 2000.
*829 Steven F. Schmitt and John G. Smith of Schmitt, Harper & Smith, P.C., Tallassee (rehearing brief filed by John G. Smith of Harper & Smith, P.C., Tallassee), for appellant.
Norman E. Waldrop, Jr., and Broox G. Holmes, Jr., of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, L.L.C., Mobile, for appellee.

On Application for Rehearing
BROWN, Justice.
The opinion of June 30, 2000, is withdrawn and the following opinion is substituted therefor.
Shellie Mock, Jr., appeals from a judgment entered on a jury verdict in favor of the defendant Dr. Robert Allen. We affirm.
The evidence presented at trial established that in September 1991, Mock was involved in an automobile accident while he was in Austin, Texas. As a result of the accident, he suffered injuries to his head, neck, back, left hip/groin area, and left knee. Mock was treated in the emergency room of a hospital in Austin. Because Mock complained of pain in his neck, back, and left hip and groin area, the treating physician x-rayed Mock's left hip and his spine; the results showed no injury. Mock was subsequently released.
*830 Mock returned home to Alabama, where he sought treatment from Dr. Andy Kirk for pain and bruising. While he was a patient of Dr. Kirk's, Mock also sought treatment from Scott Hannen, a local chiropractor. However, Mock continued to experience pain in his neck, back, left hip, and left leg. Hannen suggested that Mock see Dr. Robert Allen, a local neurologist.
Mock first saw Dr. Allen on November 19, 1991. During Mock's initial appointment, he advised Dr. Allen of his complaints. Dr. Allen performed a thorough physical examination, paying particular attention to the areas where Mock had complained of experiencing painthe neck, back, left hip/groin area, and left leg. According to Mock, Dr. Allen fondled his genitals during this examination. Dr. Allen denied doing so. Following his examination, Dr. Allen's initial diagnosis was that Mock was suffering from cervical and lumbar strain. Dr. Allen wanted to rule out radiculopathy, a disease that would cause pain to radiate through the nerves extending from Mock's spine, through his pelvic region, and into his injured left leg. Dr. Allen determined that several tests needed to be performed before he could make an accurate diagnosis, including an electromyographic test (an "EMG") and a magnetic-resonance-imaging test (an "MRI"). These tests were performed at Southeast Alabama Medical Center on November 21 and 25, 1991.
Mock returned to Dr. Allen's office for a follow-up visit on November 25, 1991. After reviewing Mock's EMG and MRI results, Dr. Allen diagnosed Mock as suffering from cervical and lumbar strain. He prescribed a course of treatment that included cervical traction and the prescription medication Limbitrol, a muscle relaxant. Mock claimed that Dr. Allen again fondled him during a physical examination on that follow-up visit. Although Dr. Allen did not recall conducting a physical examination on Mock on that occasion, he said that he may have done so. Dr. Allen, however, denied fondling Mock. At the conclusion of the visit, Dr. Allen instructed Mock to return for another follow-up visit in two weeks.
One week later, on December 3, 1991, Mock called Dr. Allen's office, complaining of severe pain. He asked for an immediate appointment. Later that day, Dr. Allen examined Mock. Upon examining Mock's neck, back, and left groin area, Dr. Allen determined that the traction had failed to improve his condition. Dr. Allen gave Mock two injectionsone of celestone soluspan, and one of phenobarbital and instructed him to remain in the examining room for approximately 15 minutes. According to Dr. Allen, this was standard procedure, to ensure that Mock did not have an adverse reaction to the medications. According to Mock, the injections knocked him out and when he awoke Dr. Allen was sitting between his legs "messing with" his genitals. Mock stated that he asked Dr. Allen what he was doing and that Dr. Allen said he was checking for a hernia.
Dr. Allen denied touching Mock; he stated that he went in the examining room to see if Mock had had any adverse reaction to the medications, and that when he discovered that he had not, he told him that he could get dressed and leave. Mock dressed and left the office. However, he telephoned Dr. Allen's office the following day, again complaining of severe pain. Dr. Allen spoke with Mock; he gave him the option of returning to his office for another course of injections, or going to the hospital. Mock chose hospitalization, and Dr. Allen's office arranged for him to be admitted to Southeast Alabama Medical Center.
Mock was hospitalized from December 4 to December 10, 1991. As required by *831 hospital policy, Dr. Allen performed an initial examination of Mock. Dr. Allen did not recall whether he touched Mock's genitals during that examination, but he stated that it was possible that he did. Dr. Allen ordered intravenous pain medication and muscle relaxants for Mock; he also prescribed intensive physical therapy. Dr. Allen made daily follow-up visits to Mock, to determine how he was responding to the treatment. Mock claimed that during each visit, Dr. Allen fondled him. Mock stated that following one of Dr. Allen's visits, his aunta nurse at the hospitalcame by to visit and he broke down and told her what had happened.
After several days, Mock's condition began to improve, and Dr. Allen switched Mock from intravenous to oral medications. Dr. Allen testified that on December 9 he determined that Mock's condition had improved sufficiently so that he could be released from the hospital the following day. Mock maintained that his December 10 release was triggered by a confrontation he had had with Dr. Allen, in which he told Dr. Allen that Dr. Allen could not touch his genital area anymore. Shortly after this confrontation, Mock says, he was told that he was being discharged from the hospital.
Upon his discharge from the hospital, Mock was given prescriptions for Voltaren and Elavil, and an appointment card showing a December 19, 1991, office visit with Dr. Allen. On December 12 Mock telephoned Dr. Allen and told him that he was still in pain and that he wanted additional medication. Dr. Allen refused to give Mock any more medication. It appears that, at this point, the doctor-patient relationship between Mock and Dr. Allen ended, and each party claims to be the one who ended the relationship. Mock stated that not long after his discharge, he contacted the hospital and complained about Dr. Allen's alleged improper conduct.
Dr. Allen denied that he had touched Mock improperly. Moreover, three nurses who cared for Mock during his hospital stay testified that Mock did not complain of improper conduct by Dr. Allen and that he did not exhibit any signs of emotional distress. Mock made no allegations against Dr. Allen to Dr. William Reynolds, the internist he saw on December 12, 1991, or to Dr. William Hanson, the orthopedic surgeon who treated him beginning in April 1992. Dr. Hanson testified that Mock first consulted him in April 1992 complaining of pain in his chest and on his left side. Dr. Hanson also testified that Mock told him that he was suffering pain in his left pelvic area. Dr. Hanson's notes described the pain as being in the iliac crest, where the sartorius muscle originates. Dr. Hanson testified that the sartorius muscle runs from the pelvic/groin area to the inner knee, and that an examination of the muscle required that it be palpated.
The only physician to whom Mock related his complaints against Dr. Allen was Dr. Alan Prince, another local neurologist from whom Mock sought treatment. Dr. Prince testified that an examination of Mock based on his complaints would not have required touching his genitals.
At trial, Mock objected to the trial court's ruling that his action against Dr. Allen was governed by the Alabama Medical Liability Act, § 6-5-540 et seq., Ala. Code 1975 (the "AMLA"). As part of his case, Mock unsuccessfully attempted to offer evidence of other alleged wrongful acts by Dr. Allen, namely, that Dr. Allen had had improper contact with five other male patients, each of whom was prepared to testify that Dr. Allen had touched them inappropriately during an examination. The trial court also prohibited Mock's attempt to offer evidence of Dr. Allen's alleged sexual preference. Mock's case against Dr. Allen was submitted to a jury, *832 which returned a verdict in favor of Dr. Allen.

I.
Mock first argues that the trial court erred in ruling that his claims against Dr. Allen were governed by the AMLA.
The AMLA applies "[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." § 6-5-548(a), Ala.Code 1975. A "health-care provider" includes a "medical practitioner," that is, a medical doctor or osteopath licensed to practice in Alabama. §§ 6-5-542(1) and 6-5-481(1), Ala.Code 1975. Although the AMLA applies only to medical-malpractice actions, a plaintiff cannot avoid application of the AMLA by "creative pleading." This Court has consistently held that it is the substance of the action, rather than the form, that is the touchstone for determining whether an action is actually one alleging medical malpractice. Allred v. Shirley, 598 So.2d 1347 (Ala.1992); Benefield v. F. Hood Craddock Clinic, 456 So.2d 52 (Ala. 1984); Sellers v. Edwards, 289 Ala. 2, 265 So.2d 438 (1972).
Over the years, this Court has been called upon to determine whether a number of cases filed against physicians and other health-care providers were, in fact, governed by the AMLA. We have held generally that "[c]laims alleging misrepresentations made during the course of a doctor-patient relationship are claims of malpractice and are governed by the AMLA." Ex parte Sonnier, 707 So.2d 635, 638 (Ala.1997) (citing Benefield v. F. Hood Craddock Clinic, 456 So.2d at 54). This Court has also held that informed-consent claims brought against physicians and surgeons are governed by the AMLA. See Otwell v. Bryant, 497 So.2d 111 (Ala.1986); Fain v. Smith, 479 So.2d 1150 (Ala.1985). Furthermore, this Court has held that claims brought against health-care providers purporting to be claims under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") are governed by the AMLA, when the act forming the basis of the patient's claims occurred during the course of the treatment and constituted the treatment sought from the health-care provider. Mobile Infirmary v. Delchamps, 642 So.2d 954, 956-57 (Ala.1994) (two-year statute of limitations contained in the AMLA applied to a patient's action against a health-care provider for damages under the AEMLD arising out of the surgical placement of a temporomandibular implant in her jaw).
Mock argues, however, that the AMLA does not apply to his case because "[t]he acts of intentional sexual assault of which [he] complains were for no medical reason." He cites Gunter v. Huddle, 724 So.2d 544 (Ala.Civ.App.1998), as support for his contention. In Gunter, the Court of Civil Appeals held that a sexual relationship between a patient and a nonpsychiatric physician was outside the scope of the physician's professional services and did not constitute professional malpractice, in the absence of evidence that the patient had been led to believe by that physician that the sexual relationship was part of the patient's treatment. 724 So.2d at 546. Although the Gunter decision presented a question of first impression in Alabama, the decision followed the general rule applied in other jurisdictions.
However, the instant case does not involve allegations of a sexual relationship, as was the case in Gunter, where the alleged sexual relationship between the patient and her physician was conducted in an office setting as well as away from the office. Indeed, most of the reported cases where appellate courts have declined to hold that the physician's conduct constituted professional malpractice involved either *833 an intimate sexual relationship or sexual misconduct having no connection with the rendering of professional services. See St. Paul Ins. Co. of Illinois v. Cromeans, 771 F.Supp. 349, 352-53 (N.D.Ala.1991) (physician's sexual conduct toward minor patients masturbating in front of them, fondling the patients, attempting to convince patients to have sex with himdid not constitute professional services, and, thus, physician's conduct was not covered by his malpractice insurance); McQuay v. Guntharp, 336 Ark. 534, 540-41, 986 S.W.2d 850, 853 (1999) (physician's fondling of a patient's breasts while using a stethoscope to listen to her heart and lungs did not constitute malpractice); Atienza v. Taub, 194 Cal.App.3d 388, 393, 239 Cal.Rptr. 454, 457 (1987) (sexual relationship between patient and physician who was treating her for an industrial injury did not constitute malpractice); Odegard v. Finne, 500 N.W.2d 140, 143 (Minn.Ct.App.1993) (sexual relationship between patient and physician who was treating her for colitis was not malpractice); Mindt v. Winchester, 151 Or.App. 340, 345, 948 P.2d 334, 336 (1997) (sexual relationship between patient's wife and the physician treating the patient for infertility was not malpractice); New Mexico Physicians Mut. Liability Co. v. LaMure, 116 N.M. 92, 95-96, 860 P.2d 734, 736-37 (1993) (physician's sexual assault of patient he was treating for an infected thumb was not malpractice and thus was not covered under his malpractice insurance); Standard Fire Ins. Co. v. Blakeslee, 54 Wash.App. 1, 9, 771 P.2d 1172, 1176 (1989) (sexual assault of patient by her dentist was not malpractice and thus was not covered by dentist's malpractice insurance).
By contrast, in cases where the alleged sexual misconduct occurs as part of a physician's examination and/or treatment of a patient, the conduct is considered to have occurred during the delivery of professional services, and is therefore cognizable as a medical-malpractice claim. See Hagan v. Antonio, 240 Va. 347, 397 S.E.2d 810 (1990) (physician's act of fondling patient's breasts and making improper comments during what was supposed to be a routine breast examination occurred during the delivery of professional services). Here, Mock went to Dr. Allen complaining of pain to his neck, back, left hip/groin area, and left leg. It was incumbent upon Dr. Allen to examine the painful areas thoroughly in order to diagnose Mock's complaint. Moreover, Dr. Allen testified that he wanted to rule out radiculopathy, a nerve condition originating in the spinal area and extending through the groin and into the leg. Given these circumstances, Dr. Allen's alleged sexual misconduct occurred while he was providing professional services and/or treating Mock's physical injuries. Accordingly, the misconduct Mock accuses Dr. Allen of falls within the ambit of the AMLA.

II.
Mock next argues that the trial court erred in ruling that evidence of other similar wrongful acts allegedly committed by Dr. Allen against five other male patients was inadmissible.
As noted above, the trial court properly determined that Mock's action against Dr. Allen was governed by the provisions of the AMLA. Therefore, § 6-5-551, Ala. Code 1975, was applicable. That section provides, in pertinent part:
"In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care the plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff.... Plaintiff shall be prohibited from *834 conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
In Ex parte Northport Health Service, Inc., 682 So.2d 52 (Ala.1996), the administrator of a deceased nursing-home resident's estate sued the nursing home, claiming that the facility's employees had abused, mistreated, or neglected the resident. The administrator sought discovery of "similar acts" of abuse. Following the trial court's order finding that information discoverable, the nursing home petitioned this Court for a writ of mandamus. This Court held that the AMLA barred a plaintiffs discovery of "similar acts" or "pattern-and-practice" evidence, and ordered that the trial court vacate its previous discovery order. 682 So.2d at 55-56. Likewise, in Ex parte Golden, 628 So.2d 496 (Ala.1993), the plaintiff sued a dentist, claiming that the dentist had engaged in a scheme to defraud his patients. The plaintiff sought discovery of similar acts the dentist had allegedly engaged in with other patients. The trial court denied the discovery, and the plaintiff petitioned this Court for a writ of mandamus. We denied the petition, holding that, contrary to the plaintiff's claims, her case was governed by the AMLA and, thus, that discovery of such evidence was prohibited by § 6-5-551. 628 So.2d at 498.
Mock argues that § 6-5-551 does not provide a blanket prohibition on the discovery or admissibility of "similar-acts" evidence. He points to our decision in Ex parte McCollough, 747 So.2d 887 (Ala. 1999), as support for his contention. McCollough, however, is factually distinguishable from the instant case. McCollough stands merely for the proposition that evidence of other acts similar to those alleged in the complaint in that case was discoverable, not that it was admissible. The fact that evidence is discoverable does not mean that it will be admissible at trial. See Rule 26(b)(1), Ala.R.Civ.P. ("It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."). Moreover, in a recent decision, this Court implicitly recognized the inadmissibility of such evidence at trial. In Crowne Investments, Inc. v. Reid, 740 So.2d 400 (Ala.1999), the granddaughter of a deceased nursing-home resident sued the nursing home, claiming that the facility's breach of the applicable standard of care had resulted in her grandfather's death. At trial, the judge admitted testimony regarding other acts and omissions by the nursing home. The jury returned a verdict in favor of the granddaughter. On appeal, the nursing home argued that the evidence of other acts and omissions was inadmissible under § 6-5-551. We rejected the nursing home's claim, but implicitly recognized that such evidence was normally inadmissible, stating: "A party who opens the door to an otherwise objectionable area of testimony cannot claim error when the opposing party introduces similar evidence." 740 So.2d at 408. Thus, because the action against Dr. Allen was governed by the AMLA, which includes the provisions of § 6-5-551, Mock was entitled to introduce only evidence concerning Dr. Allen's alleged wrongful acts against him personally; evidence of other wrongful acts allegedly committed by Dr. Allen was properly excluded.

III.
Mock also argues that the trial court erred by refusing to allow him to offer evidence concerning Dr. Allen's alleged sexual preference.
An examination of the record reveals that at trial Mock sought to read from Dr. *835 Allen's deposition the question, "Are you a homosexual?" and also to read Dr. Allen's denial. Mock then wanted to offer testimony from Dr. Alan Prince to the effect that Dr. Allen had once told him that he had engaged in a homosexual relationship. Mock's argument to the trial court appeared to be that evidence of Dr. Allen's homosexuality would establish Dr. Allen's motive to molest male patients. The trial court determined that the evidence was not relevant at that time, and prohibited Mock's attorney from eliciting this testimony from Dr. Prince.
"A trial court has great discretion in determining the admissibility of evidence, and its rulings will not be reversed on appeal absent an abuse of discretion." Grayson v. Dungan, 628 So.2d 445, 447 (Ala.1993); see also Charles W. Gamble, McElroy's Alabama Evidence § 21.01(6) (5th ed.1996). As this Court explained in Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998):
"The standard applicable to a review of a trial court's rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence. `The test is that the evidence must ... shed light on the main inquiry, and not withdraw attention from the main inquiry.' Atkins v. Lee, 603 So.2d 937 (Ala.1992) (citing Ryan v. Acuff, 435 So.2d 1244 (Ala. 1983)). The second principle `is that a judgment cannot be reversed on appeal for an error unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.' Atkins, 603 So.2d at 941."
Here, the trial court acted within its discretion in barring the proffered testimony. Whatever the probative value of this evidence, it was substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court properly excluded that evidence.

IV.
Based on the foregoing, the judgment of the trial court is affirmed.
OPINION OF JUNE 30, 2000, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
HOOPER, C.J., and MADDOX, HOUSTON, COOK, and JOHNSTONE, JJ., concur.
LYONS and ENGLAND, JJ., dissent.
SEE, J., recuses himself.
LYONS, Justice (dissenting).
I respectfully dissent. On June 30, 2000, when this Court released its original opinion, I dissented and Justice England and I joined a dissent written by Justice See. On this application for rehearing, Justice See has recused himself. The majority today withdraws the opinion released on June 30 and substitutes a different opinion; Justice See's dissent is not included with the opinion released today. I adhere to the views Justice See expressed in the dissent he issued on June 30, 2000; rather than attempt to restate those views, I attach a copy of Justice See's June 30, 2000, dissent as an appendix to this special writing.
ENGLAND, J., concurs.

APPENDIX TO JUSTICE LYONS'S DISSENT
"SEE, Justice (dissenting [from original opinion of June 30, 2000]).
"The dispositive issue is whether the Alabama Medical Liability Act of 1987, Ala.Code 1975, § 6-5-540 et seq. (the `AMLA'), applies to this action against a *836 physician. The plaintiff alleges that the defendant, Dr. Robert Allen, improperly `fondled, stroked, caressed or otherwise touched' the plaintiff's genitals during medical examinations. Dr. Allen testified that there was no medical reason for him to engage in the conduct of which he is accused. As to one of the alleged incidents, Dr. Allen testified that he did not remember whether he touched the plaintiff's genitals, but that if he did it was medically appropriate. As to all the other alleged incidents, Dr. Allen stated that there was no medical reason for him to stroke the plaintiff's genitals and that he did not do so.
"The trial court held that the AMLA applies to this case and that that Act bars the plaintiff from presenting evidence indicating that Dr. Allen had fondled or stroked the genitals of other male patients. The trial court refused to allow Mock to introduce the testimony of five other patients. The jury found for Dr. Allen, and the court entered a judgment on the verdict. The majority affirms. I do not believe the AMLA applies to all of the alleged incidents; therefore, I must respectfully dissent.

"I.
"Shellie Mock, Jr., was injured in an automobile accident in 1991. In November 1991, he became a patient of Dr. Allen, a neurologist. Dr. Allen examined or treated Mock several times in November and December 1991. In October 1993, Mock filed this action against Dr. Allen, alleging that Dr. Allen had committed the tort of battery against him when, he said, Dr. Allen `fondled, stroked, caressed or otherwise touched [Mock's] genitals without [Mock's] consent and with no medical reason.'1 Five years later, in 1998, Dr. Allen, for the first time, asserted that the AMLA applied to this case. Dr. Allen filed a motion in limine, asking the trial court to exclude all evidence of similar acts involving other patients, on the ground that such evidence would be inadmissible, pursuant to § 6-5-551.2 Mock opposed the motion, arguing that the AMLA did not apply to this case, because, he argued, Dr. Allen's alleged improper touching of Mock's genitals was outside the scope of the medical treatment. The trial court granted Dr. Allen's motion and excluded the testimony of five other male patients of Dr. Allen, each of whom would have testified that Dr. Allen had improperly stroked his penis during physical examinations or treatment.3 Thus, the trial was essentially a credibility contest between Mockwho testified that Dr. Allen on several occasions improperly touched Mock's genitals and Dr. Allenwho claimed he did not. The jury, apparently finding Dr. Allen a more credible witness than Mock, returned a verdict in favor of Dr. Allen, and the trial court entered a judgment on that verdict.

"II.
"Mock argues that the AMLA does not apply to his action against Dr. Allen and, therefore, that the trial court erred in excluding the other five patients' testimony that Dr. Allen improperly touched their genitals. Subject to one qualification, I agree.
"The Legislature declared that it enacted the AMLA in response to increasing health-care costs caused by `the increasing threat of legal actions for alleged medical injury.' Ala.Code 1975, § 6-5-540. The AMLA applies to actions against a health-care provider alleging a `breach of the standard of care.' Ala.Code 1975, § 6-5-540 et seq. A breach of the standard of care is the `fail[ure] to exercise such reasonable *837 care, skill and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in a like case.' § 6-5-548. Thus, the AMLA applies to conduct that is, or that is reasonably related to, the provision of health-care services allegedly resulting in a medical injury. Just as the Alabama Legal Services Liability Act does not apply to every action against a person who is a lawyer, see Cunningham v. Langston, Frazer, Sweet & Freese, P.A., 727 So.2d 800 (Ala.1999), the AMLA does not apply to every action against a person who is a doctor, see Thomasson v. Diethelm, 457 So.2d 397 (Ala.1984). It does not, I believe, apply to an action alleging sexual molestation, where the health-care provider concedes that the acts complained of were not medically relevant. Although Mock's claims arise out of conduct that took place at a time when there was a doctor-patient relationship for the purpose of examination and treatment, see Thomasson, that fact alone cannot subject to the provisions of the AMLA all conduct by the doctor, however unrelated to the provision of medical services. Mock alleges that Dr. Allen, during otherwise legitimate medical examinations, did something that Dr. Allen concedes would have been outside the scope of legitimate medical treatment.4 At trial, Dr. Allen testified that, with one possible exception, he had no reason to, and did not, examine Mock's genitals.
"The majority concludes that the AMLA applies to Mock's claims against Dr. Allen. As to the alleged incident that Dr. Allen testified might have involved a medically appropriate examination of Mock's genitals, I agree. However, as to the other alleged incidents, I disagree. Dr. Allen testified that, as to those alleged incidents, there was no medical reason for him to touch Mock's genitals, and he has flatly denied doing so. Dr. Allen should not be able to avail himself of the protections of the AMLA with respect to these alleged incidents, which by Dr. Allen's own admission do not involve an alleged breach of the standard of care to be followed in rendering medical treatment.

"III.
"The trial court excluded the testimony of Dr. Allen's other patients because the AMLA prohibits the introduction of evidence concerning acts other than the one `alleged by [the] plaintiff to render the health care provider liable to [him].' Ala. Code 1975, § 6-5-551. Had the trial court not incorrectly concluded that the AMLA applied, that court would have had the discretion to admit or to exclude the proffered evidence, see, e.g., Bama's Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998), except as to the alleged incident regarding which Dr. Allen testified that he might have examined Mock's genitals for medical reasons. I would reverse the judgment in favor of Dr. Allen and remand this case for a new trial on the alleged incidents of battery regarding which Dr. Allen has denied touching Mock's genitals; the AMLA would not apply to that trial. Accordingly, I dissent from the affirmance of the judgment in favor of Dr. Allen. Because of the implications of the majority's affirmance an affirmance based on the conclusion that the AMLA applies to a claim against a physician even if the allegation of liability is based on an act or omission that is not even arguably a part of the physician's provision of health-care services,5 I believe the trial court's judgment should be reversed and the case remanded.
"___________
*838 1. "Mock also sued Southeast Alabama Medical Center (`SAMC'), where he had been a patient under Dr. Allen's care for a few days. The trial court entered a summary judgment for SAMC; that summary judgment is not at issue in this appeal.
2. "Ala.Code 1975, § 6-5-551, provides:
"`In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care the plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff. The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Plaintiff shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief can be granted.'
"(Emphasis added.)
3. "Three of the witnesses had been minors when they were Dr. Allen's patients. One of the adult witnesses, who went to Dr. Allen seeking treatment for headaches, would have testified that `[o]n at least four or more occasions, Dr. Allen masturbated [him] until he ejaculated.' Another would have testified that, although he had no complaints about his prostate, rectum, or groin, Dr. Allen `checked' his rectum on two occasions, and that, on a third visit, Dr. Allen rubbed lotion on his thighs and then `grabbed' his penis, at which time, he said, he looked at Dr. Allen with incredulity and Dr. Allen abruptly left the room. At least two of the witnesses would have testified that Dr. Allen did not wear gloves when he stroked their genitals.
4. "Dr. Allen testified in his deposition that `there was no medical or neurological reason that I would have needed to fondle, stroke, or caress Mr. Mock's genitals during the period of time that I saw him from November 19 through December 10, 1991.' He further testified, `There are situations under which a physician may need to stroke, in a medical sense, not in a sexual sense, stroke a person's genitals for purpose of other examination; within the context of my dealing with Mr. Mock, there is no reason that I am aware of that I would have needed to have stroked his genitals, and I did not do that.'
5. "Under the principle implicit in the majority's decision, were a doctor to shoot a patient, the AMLA would apply if that shooting took place during a medical examination."