PER CURIAM.
This is the second time these parties have appeared before this court. See Heyat v. Rahnemaei, 107 So.3d 216 (Ala.Civ. App.2012). In Heyat, we dismissed an appeal filed by Mohammad Heyat (“the husband”) and a cross-appeal filed by An-ahita Rahnemaei (“the wife”) from a judgment divorcing the parties because the trial court’s judgment was not final. Heyat, 107 So.3d at 218. The trial court has since rendered a final judgment, and the parties have again sought appellate review.
*1212 The husband and the wife were married in 1985 in Iran. At the time, the husband was a student in the United States. He had received his bachelor’s degree in civil engineering and planned to seek a master’s degree in the same subject matter; he worked as a waiter to support himself. He had traveled back to Iran for the purpose of meeting and marrying an Iranian woman. After a mutual friend of both the husband’s family and the wife’s family mentioned that the husband was seeking a wife and that the wife was of the appropriate age, the families met. After a few months, the husband asked the wife to marry him; she said that her parents had approved of the idea, so she agreed to marry the husband. After their marriage, it took nearly two years for the husband to secure a visa for the wife to enter the United States. During nearly all of that two-year period, the wife lived with her parents in Iran and the husband lived in Birmingham.
When the wife joined the husband in Birmingham in 1987, she could not speak English. She took classes at churches to learn the language, and, in 1989, she began classes in nuclear-medicine technology at a local junior college. In 1990, while she was a student, the wife gave birth to the parties’ first child, a daughter (“the daughter”). The parties first lived in an apartment, but they later purchased a home in Southside (“the Southside house”). The wife completed her bachelor’s degree in nuclear-medicine technology at the University of Alabama at Birmingham in 1995.
The wife began working in 1995. She worked full time for some period but then began working only part time, presumably when she gave birth to the parties’ second child, a son (“the son”), in 1998. The wife has continued to work since that time, but she has worked only three or four days per week since 2004. At the time of the trial in this matter in July 2011, the wife was earning $5,100 per month working four days per week.
During the first few years that the wife attended college, the husband continued working as a waiter and then began working as a construction superintendent for two separate contractors. Eventually, in 1992, the husband built his first house as a builder. He said that he purchased a lot, secured a construction loan, built the house, and sold it before construction was completed. He testified that he made a $31,000 “profit” on that home. The husband then began doing business as Brook-field Construction Company. The husband built a second house (“the Ridgewood house”) in the same neighborhood as the first. That second house, however, did not sell, and the parties moved into that house in approximately 1995. They then rented the Southside house.
-The husband next took on as a project the construction of a custom-built home in a neighborhood called Weatherly. According to the husband, he earned approximately $90,000 on that project, with which he paid off the mortgage on the Ridge-wood house. After completing the project in Weatherly, the husband built 13 “spec houses” in a neighborhood called Eagle Point (“the Eagle Point houses”). Those houses sold; however, one homeowner sued the husband over some issues concerning the construction of the house. That lawsuit was settled, but it cost the husband $100,000 in settlement funds and legal fees. The wife provided the husband the $100,000 from money she had saved for the daughter’s college education.
After the husband completed the Eagle Point houses, he began constructing the largest home he had ever built in the Greystone neighborhood, located in Shelby County (“the Greystone house”). According to the husband, he used the money he *1213 had earned from his other projects to fund the construction of the Greystone house and the construction was not funded by the proceeds of a construction loan. The husband testified that all of his money was tied up in the Greystone house and that, in fact, he ran out of money while completing the house. When the Greystone house did not sell immediately, the wife convinced the husband that they should move from the Ridgewood house to the Greystone house, which they did in December 2006.
The husband then began to remodel the Ridgewood house in order to sell it. He explained that he remodeled the kitchen in the Ridgewood house by tiling the floor, putting in marble countertops, changing cabinet doors, “updating the plumbing,” and replacing the fixtures and sink. According to the husband, the remodeling project cost approximately $55,000 and took more than a year to complete because he did not have the money to complete the project all at one time. The Ridgewood house sold in 2010 for approximately $203,000.
The Greystone house was the last house the husband built. After the parties moved into the Greystone house, the wife began having issues with the husband’s lack of remunerative employment. She said that she had urged him to get a job of some kind to provide support for the family but that, instead, the husband became more “fervent” in his religious beliefs and in his attendance at a mosque. She explained that, although both he and she were Muslim, they had not strictly complied with the tenets of their religion. However, the wife testified that, beginning in 2006 or 2007, the husband began to attend mosque much more frequently, sometimes even more than once per day, and that, in doing so, he neglected his responsibilities to his family.
The wife, her friend, Shahin Rogers, and the daughter testified that the husband had expressed anti-American sentiments. As examples, the wife and the daughter testified that the husband had celebrated the September 11, 2001, terrorist attacks and that he also would say, in his native Iranian language, Farsi, “God is good,” when he heard of the death of American soldiers on the television news. The daughter testified that the son had begun chanting “death to America” around the house, presumably as a result of the husband’s influence. The wife testified that she did not want the husband taking the son to the mosque several times a week because, according to her, “there is nothing you can do in the mosque, just sit there and be taught things I don’t want him to learn. Things that are part of how to become a terrorist.”
Rogers testified that she had had to ask the husband and others attending a party at her home to stop discussing politics when a discussion regarding the propriety of American involvement in the Middle East became heated; she did not, however, testify that she had overheard anti-American sentiments from the husband at that time. Under further cross-examination by the husband’s counsel, Rogers testified that the husband had said that he did not like living in America and that he desired to return to Iran. She also testified that the husband had said at other times that he would like to volunteer for either the North Korean or the Afghan army so that he could fight against America.
The husband denied having ever expressed anti-American sentiments. He also said that he had grieved the September 11, 2001, terrorist attacks and that he and his family had attended a candlelight vigil for the victims of those attacks. He said that he loved America, although he *1214 did admit that he did not support “the war.” He denied that he had ever said that he would like to return to Iran to live.
The wife testified that the husband had financed and supervised the building of two “flats” or apartments in Iran (“the Iranian apartments”). The husband denied having any interest in those apartments, although he admitted that he “thought” that he had “loaned” money to his family to assist with the construction of those apartments. The record contains ' two sets of documents purporting to show the ownership interests in those apartments. One set of documents indicates that the husband owned both of the apartments, while the other set indicates that, as of the time of trial, neither was owned by the husband.
The husband admitted that he had not sought other employment after his ability to make a living as a builder had ended. He blamed the economy for ending his ability to support his family through his home-building business. He said that he , had not advertised his business at any time. When questioned, he admitted that he had had a few jobs doing work like adding a porch or painting, but he said that he had not actively sought such work despite his ability to perform it. Upon further questioning regarding his income while he was building houses, the husband appeared confused regarding the income he reported on his tax returns; he stated that he had followed “the book of the I[nternal] R[evenue] S[ervice]” when computing his income and filling out his tax returns. Notably, the husband’s tax returns do not show that he earned significant income from his construction business.
The husband was also questioned about his ability to pay $800 per month in rent for his apartment and meet his other living expenses when he claimed that he did not earn any income. The husband’s rental application lists his income as $13,330 per month; the husband stated that he had not written that amount as. his income on the rental application. Despite the fact that the husband claimed that he had no income, the husband admitted that he was current on his $800 monthly rent payments. When asked how he paid his rent, the husband admitted having taken a few small jobs like painting or constructing a porch and also said that friends at his mosque had lent him money. The husband further explained that he had taken some money out of an account and had kept it hidden away because all of his accounts were frozen by court order when the wife instituted the divorce action; he said he used some of that money when needed to pay expenses. He also said that he had used the $500 per month that he was permitted to withdraw from one account to pay his rent; counsel for the wife reminded him that that account had been exhausted in May 2011. The husband admitted that he had purchased a video-game console, which cost over $400, for the son, instead of providing any support for the wife and the son during the pendency of the divorce action.
The incident that provoked the wife to file the divorce action took place in late July 2010. According to the wife, the husband became irate at a dinner. The wife’s mother (“the mother-in-law”) was visiting at the time, and she had been staying at the parties’ home for a few months. The wife said that the husband began being disrespectful toward the mother-in-law and threatened to have her arrested and handcuffed. The wife said that the husband began yelling about how the Greystone house had been built for four people and that the mother-in-law should not be living there. In addition, the wife testified, the husband said that he would not leave the *1215 house for the wife and the mother-in-law to live in and that he would burn down the house. When the wife began telling the husband that he should not treat the mother-in-law with such disrespect, she said that the husband threatened to take the wife to the backyard and cut off her head. During this same argument, the wife testified, the husband called the daughter, who was at least 21 years old at the time, a whore in Farsi and began complaining that she called “boys” on the telephone late at night and that she dressed inappropriately. Both Rogers and the daughter testified similarly to the wife.
The husband remembered certain details of that incident differently. He said that he had been fasting as part of his observance of Ramadan, a month-long Muslim religious observance, when the wife had called him to the table. Because he was fasting and the time to break his fast had not yet come, the husband said, he went to the table to speak with the guests in his home but not to eat dinner. He referred to the incident as an “ambush.” He said that he was questioned regarding his thoughts about women and that the wife announced that she wanted a divorce and that she should be awarded the Greystone house in the divorce. The husband said he became very upset and that he had said some things in anger, including, quite possibly, that he could cut off the wife’s head; however, he testified that it was not in his nature to do such a thing. He denied saying that he would burn down the Greystone house; instead, he said, he had been saying that he would not act like someone on the news who had burned down his house.
When questioned regarding the allegation that he had called the daughter a whore, the husband denied having called the daughter “such a thing.” He admitted that he had had concerns about the daughter’s behavior and dress. He said that he had never addressed his concerns over the daughter’s behavior or dress with her directly. He said that he had always gone to the wife and urged her, as the female role model for the daughter, to lead the daughter to behave more modestly. To have addressed such things directly with the daughter, said the husband, would have embarrassed her or made her uncomfortable. Although the wife had testified that the husband had said that he hoped the daughter would get breast cancer because she wore clothing that revealed her cleavage, the husband denied having ever made such a statement.
The son testified in camera. He testified that he would prefer to live with the husband. He denied that the husband had expressed anti-American sentiments or that the husband wanted to return to Iran to live. The son said that the husband wanted to visit Iran and that the son wanted to go with him; the son said that he had visited Iran before. When asked why he would prefer to live with the husband, the son explained that he was 13 years old and that he thought he needed a fatherly influence at his age. The son also testified that he liked living with the wife; he said that the worst thing about living with her was that when she became angry she “lost control” and yelled. The son testified that he was involved in math team, Scholar’s Bowl, and Science Olympiad at school.
The wife filed a complaint seeking a divorce on August 26, 2010. In her complaint, the wife requested custody of the parties’ son, child support, alimony, an award of all the parties’ joint property, to be held harmless of all debts of the parties, and an attorney fee. The wife, by motion, also sought ex parte pendente lite custody of the son, possession of the marital residence pendente lite, and pendente lite child support; the trial court granted the *1216 wife’s motion on August 27, 2010. The husband filed an answer and a counterclaim. In his answer, the husband specifically stated that he did not want a divorce; however, in the event one was granted, the husband sought custody of the parties’ son, child support, alimony, an equitable division of the parties’ property, to be held harmless from all debts of the parties, and an attorney fee.
On the husband’s motion, the trial court set aside the ex parte custody order, and the parties entered into a pendente lite agreement, which the trial court adopted in an order, concerning custody of the son and payment of certain of the parties’ expenses and debts; the agreement did not require the husband to pay child support. In addition, three accounts owned by the parties were “frozen” by the pendente lite order. As noted above, the parties agreed to an arrangement permitting the husband to withdraw $500 per month for living expenses and $450 per month to pay the mortgage on the Southside house.
After the trial in July 2011, the trial court entered a judgment divorcing the parties. The judgment awarded custody of the son to the wife and awarded the husband specified visitation; the husband was also ordered to pay $991 per month in child support. Pursuant to the judgment, the wife was awarded exclusive possession of the Greystone house, which was to be sold and the proceeds divided equally, after a deduction from the proceeds of $100,000, an amount that the husband agreed he owed the wife. The wife was given the option of purchasing the husband’s interest in the Greystone house for $150,000. The husband was awarded the Southside house and ordered to assume the indebtedness associated with that house. Finally, the trial court awarded the wife “a one half (1/2) interest in and to any real estate owned by the [husband] in Iran, should such ownership exist.” The judgment ordered that the attorney fees for the parties’ respective attorneys be paid out of a particular bank account of the parties. The remaining funds in that account were to be divided, with the wife receiving 75% of the remaining funds and the husband receiving 25%.
The husband and the wife each filed a postjudgment motion. The trial court amended its judgment by permitting the husband the opportunity to purchase the wife’s interest in the Greystone house for $250,000 if the wife chose not exercise her right to purchase his interest in the house within 18 months of the entry of the divorce judgment. The husband timely appealed, and the wife timely cross-appealed. As noted above, we dismissed the parties’ appeals because the trial court’s judgment failed to determine whether the husband owned real estate in Iran and, thus, was nonfinal. Heyat, 107 So.3d at 218. The trial court entered an amended judgment on December 6, 2012, in which it stated that the husband and the wife “are each awarded and vested with all right, title, and interest in and to a one-half (1/2) undivided interest in all real estate owned by the [husband] in Iran.” The husband appealed, and the wife filed a cross-appeal. The parties requested that this court incorporate the record from the previous appeals, which we did, and both rely on the briefs they submitted in the previous appeals as well.
On appeal, the husband raises several issues. He first argues that the trial court erred in admitting testimony that the husband was a religious fanatic and a “terrorist.” The husband then argues that the trial court’s failure to award him at least joint custody of the son was an abuse of the trial court’s discretion. The husband next challenges the trial court’s division of the parties’ property. Finally, the hus *1217 band argues that the trial court abused its discretion in calculating his child-support obligation when it imputed to the husband a monthly income of $5,000 despite there being a lack of evidence to support that amount and in light of the fact that the trial court’s award of the Greystone house to the wife “eliminated” the husband’s ability to earn. On cross-appeal, the wife challenges the trial court’s award to her of an undivided one-half interest in the Iranian apartments, arguing that the husband no longer owns the Iranian apartments and that she would be unable, as a woman, to enforce that property right in Iran. We will first address the issue raised by the wife in her cross-appeal.

The Wife’s Cross-Appeal

The wife has filed a cross-appeal in which she challenges only that aspect of the trial court’s judgment awarding her an undivided one-half interest in the Iranian apartments. At trial, the wife attempted to establish that the husband owned two apartments in Iran. The wife presented documents purporting to show that the husband owned the Iranian apartments; those documents, according to the wife, show that the husband still owned one apartment on December 18, 2010, and that he still owned the other apartment on January 31, 2011. However, similar documents dated April 6, 2011, and April 9, 2011, show that the Iranian apartments were, on those dates, each owned by someone other than the husband. The wife complains that the trial court’s award to her of an undivided one-half interest in the Iranian apartments is unenforceable because (1) the undisputed evidence proved that the husband no longer owns the Iranian apartments because he has transferred ownership to other people and (2) that, even if the husband still owns the Iranian apartments, she will be unable to enforce any property rights awarded her in the divorce in Iran, because neither the United States nor Iran are signatories to the Hague Convention on the Recognition of Divorces and Legal Separations of June 1, 1970, or the Hague Convention on the Law Applicable to Matrimonial Property Regimes of March 14,1978. According to the wife, because the trial court determined that she was entitled to an undivided one-half interest in the Iranian apartments, which she had testified at trial were worth $500,000, the trial court’s property division is inequitable to her because she will not be able to realize $250,000 of the property awarded to her in the divorce judgment.
In general, when reviewing any division of property, we must be mindful that the trial court has wide discretion over the division of property and that it may use whatever means are reasonable and necessary to equitably divide the parties’ property. Grimsley v. Grimsley, 545 So.2d 75, 77 (Ala.Civ.App.1989).' The trial court’s judgment is presumed to be correct and will not be reversed unless it is so unsupported by the evidence as to be unjust and palpably wrong. Grimsley, 545 So.2d at 76. In making a property division, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their ages and health, their conduct, the duration of the marriage, and the value and type of marital property. Lutz v. Lutz, 485 So.2d 1174, 1176 (Ala.Civ.App. 1986). Because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed. Murphy v. Murphy, 624 So.2d 620, 623 (Ala.Civ.App.1993).
The wife does not merely argue that, as a factual matter, the property division is inequitable, however. She argues that the legal and practical result of the award to her of an undivided one-half *1218 interest in the Iranian apartments is that she will not realize a portion of the property the trial court decided to award to her. Although the wife presented evidence tending to prove that the husband had owned the Iranian apartments, the other evidence at trial indicated that the apartments are currently owned by persons other than the husband. The wife testified, when confronted with those documents, that the husband must have transferred ownership of the Iranian apartments during the pendency of the divorce action, commenting that it was easy to do so in Iran.
As the wife points out, the trial court was permitted to determine that the Iranian apartments were marital property and that any transfer of the apartments during the pendency of the divorce was voidable. See Pattillo v. Pattillo, 414 So.2d 915, 916 (Ala.1982) (determining that a trial court should have set aside transfers of cash and certificates of deposit from a husband to his daughters because the evidence established that the transfer of those assets were made with the intent to defeat the wife’s rights and ordering the trial court to set aside those transfers and to consider those assets in its property division). However, the wife contends, the trial court could not award her an interest in the property owned by third parties. Thus, the wife explains, she will have no way of realizing her interest in the Iranian apartments. We agree.
The exhibits regarding the Iranian apartments indicate, and the testimony at trial further supports, the inescapable conclusion that, at the time of the trial, the husband no longer owned the Iranian apartments. By virtue of its award to the wife, the trial court implicitly determined that the husband had owned the Iranian apartments during the marriage and that the wife was entitled to an undivided one-half interest in the apartments, which the wife valued at $500,000. The trial court must have also determined that the transfer of the Iranian apartments was done for the purpose of defeating the wife’s rights in that property and that the apartments should be considered marital property. See Prestwood v. Prestwood, 523 So.2d 1071, 1074 (Ala.Civ.App.1988) (noting that the issue whether a transfer is made to defeat a spouse’s property rights is a question of fact). We note that the husband does not challenge the trial court’s implicit findings on these matters. Despite having made those implicit findings, however, the trial court in the present case could not have gone further and declared the transfer void because the present owners of the Iranian apartments were not parties to the divorce action. See Capps v. Capps, 699 So.2d 183 (Ala.Civ.App.1997) (reversing that portion of a trial court’s judgment setting aside as fraudulent a transfer of an undivided one-half interest in property from a husband to his mother because the mother was not a party to the action); see also Prestwood, 523 So.2d at 1074 (affirming a judgment declaring certain property that the husband had transferred to defeat the wife’s property rights to be marital property and noting that the children to whom the father had transferred the ownership interests in a marital asset were defendants in the action). In light of the facts that the apartments are located in Iran and, presumably, that the new owners are Iranian citizens, the possibility of making those new owners parties to the divorce action is remote at best. Without their being parties, the trial court cannot set aside the transfer of the Iranian apartments, and the trial court cannot award the wife any interest in those apartments because they are no longer owned by the husband.
We therefore reverse the property-division aspects of the judgment of divorce, *1219 and we remand the cause for the trial court to determine an appropriate and equitable division of the parties’ property. Because the trial court cannot set aside the transfer of ownership of the Iranian apartments, the trial court’s award to the wife must be adjusted to award her assets equal to the one-half interest in the Iranian apartments the trial court has attempted to award. We note that the trial court did not determine the value of the Iranian apartments, and, thus, on remand, the trial court is free to set that value based upon the evidence adduced at the July 2011 trial.

The Husband’s Appeal

The husband first argues that the trial court erred in admitting testimony concerning his being a religious fanatic, his alleged anti-American sentiments, and his being a “terrorist.”[1]
“Two fundamental principles govern the standard by which this Court reviews a trial court’s rulings on the admission of evidence. Middleton v. Lightfoot, 885 So.2d 111, 113 (Ala.2003). ‘ “ ‘The first grants trial judges wide discretion to exclude or admit evidence.’ ” ’ 885 So.2d at 118 (quoting Mock v. Allen, 783 So.2d 828, 835 (Ala. 2000), quoting in turn Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998)). However, ‘a trial court exceeds its discretion where it admits prejudicial evidence that has no probative value.’ 885 So.2d at 113 (citing Powell v. State, 796 So.2d 404, 419 (Ala.Crim. App.1999), aff'd, 796 So.2d 434 (Ala. 2001)).
“ ‘ “ ‘The second principle “is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.” ’ ” ’ Middleton, 885 So.2d at 113 (quoting Mock, 783 So.2d at 835, quoting in turn Wal-Mart Stores, 726 So.2d at 655). See also Rule 45, Ala. R.App. P. “‘The burden of establishing that an erroneous ruling was prejudicial is on the appellant.” ’ Middleton, 885 So.2d at 113-14 (quoting Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991)).”
Baldwin Cnty. Elec. Membership Corp. v. City of Fairhope, 999 So.2d 448, 453 (Ala. 2008).
We note that, despite a seven-page plea to this court regarding the emotionally charged atmospheres of both a divorce and of this country in the wake of the terrorist attacks of September 11, 2001, the husband cites only general authority regarding the trial court’s ability to exclude relevant evidence because its effect will be too prejudicial. See Charles W. Gamble, Gamble’s Alabama Rules of Evidence § 401 (2d ed.2002). The wife contends that the testimony regarding the husband’s religious practices and alleged anti-American sentiment was relevant to the issue of custody, especially because she alleged that the husband intended to take the son and move to Iran. The wife also argues that the husband waived his objection to such testimony because he objected only once to testimony that he had ex *1220 pressed anti-American sentiments, because the husband did not object to other testimony of a similar nature during the trial, and because his counsel elicited further testimony on whether the husband had expressed such sentiments and regarding the husband’s religious practices from the same and other witnesses. We agree with the wife that the husband waived his objection to the testimony.
The husband first objected to Rogers’s testimony concerning what she had overheard the husband say when she interrupted his conversation with two other men with whom he had been discussing the United States’ involvement in Afghanistan, Iraq, and Iran. The following exchange occurred:
“Q. And could you hear any of the words that [the husband] was saying to this other gentleman on that occasion?
“A. Yes, I did.
“Q. And what did you hear?
“A. He was — he said that he — if he was in Iran, he would have him arrested and have him killed.
“[Counsel for the husband]: Your Honor, I object. I think this is simply a poison to relevance [sic]. It has nothing to do with their domestic matters here. And by — as far as him being Iranian, I think it is simply to try to poison any opinion the Court may have of this gentleman and it is varied upon very stipulations [sic].
“THE COURT: Want to speak to the relevance of it?
“[Counsel for the wife]: Yes, sir, it does. One of the allegations, there’s a request that custody — currently, custody is vested in my client, and there’s a request of custody to be changed to [the husband] and part of the theme of our case is that [the husband] is somewhat of a — and I’m not sure how to say it — religious or Iranian fanatic, anti-American, and that I think this is a foundation or a predicate to be laid for later testimony for the Court to consider as to whether or not the child who was born and lived in America for 18 years as part of the consideration as to whether it ought to be turned over to [the husband].
“[Counsel for the husband]: Your Honor, I think it’s just throwing — it’s like playing a race car[d] in a case. It’s certainly to defame this gentleman and. has no bearing on this case.
“THE COURT: Well, I can see the relevance where you’re coming from, so I’m going to have to overrule it. I’m going to have to allow it in. Okay.”
Later, during the husband’s counsel’s cross-examination of Rogers, the following testimony was elicited:
“Q. So the argument — you heard Mr. Gordon say that [the husband is] anti-American. And that — is that what you gathered out of that argument?
“A. Out of that argument, no, because I was the — no, I didn’t.
“Q. Has [the husband] lived here longer than you?
“A. I’m not sure.
“Q. Okay. You’re not anti-American, are you?
“A. No.
“Q. You don’t have to always agree •with the politics of our government, do we, in America?
“A. No.
“Q. That doesn’t mean — does that make you anti-American, in your opinion?
“A. No.
“Q. So are you telling the Court that you believe him to be anti-American?
*1221 “A. It’s other conversation that I’ve had, I’ve heard him say different things, that he doesn’t like to live in America, he wants to go home. And several years ago, he wanted to move to Iran, and [the "wife] didn’t want to. And I was there, that I told him, you know, you don’t need to go there, you’re going to have to buy a house, and he actually said that he — he went up there and built a house on his mother’s — what—what he explained—
“Q. That he did or he will?
“A. That he did. That he did build a house, you know, two flats.”
On redirect, counsel for the wife elicited further testimony regarding the husband’s anti-American sentiment from Rogers without objection.
“Q. Also, you — he asked you questions about [the husband], whether or not you had ever heard or been around in any conversations where he was — talked about anti-American cinema [sic]. Do you remember that?
“A. Yes.
“Q. Do you recall, specifically, any conversations that you’ve had or been around, other than ones you’ve testified to, where [the husband] has expressed anything anti-American?
“A. Well, this is during the Bush era. When we were — we would be at our house and have a conversation, and he had said that he wanted to go to North — you know, volunteer for North Korea and fight against America and that he want to go home and fight against America or go to Afghanistan. But I don’t remember the particular — ”
The husband’s first objection to Rogers’s testimony came after the answer to the question was given. That alone makes the objection insufficient to preserve error. Crowne Invs., Inc. v. Reid, 740 So.2d 400, 408 (Ala.1999) (stating that “[o]ne cannot preserve error by objecting to a question after the witness has given a responsive answer” and noting that, in order to preserve error in such a situation, the belated objection should be accompanied by a motion to strike or a motion to exclude the question and answer). However, even if this court were to consider the husband’s counsel’s belated objection sufficient, the fact that other testimony about the husband’s anti-American sentiments was elicited and given by both Rogers and other witnesses without objection would preclude reversal on this issue. B & M Homes, Inc. v. Hogan, 376 So.2d 667, 673 (Ala. 1979) (“In Alabama the rule is that prejudicial error may not be predicated upon the admission of evidence which has been admitted at some other stage of the trial without objection or motion to exclude.”); see also Baldwin Cnty. Elec. Membership Corp., 999 So.2d at 453.
The husband next argues that the trial court erred in failing to award him sole custody or joint custody of the son. The husband correctly observes that a trial court considering the issue of custody should have as its focus the best interest of the child. However, he argues that the trial court erred by not awarding him sole custody despite the son’s stated preference that he live with the husband and despite testimony from the son that the wife loses control and yells a lot when she is angry. Furthermore, he argues that, pursuant to Ala.Code 1975, § 30-3-150 et seq., the Alabama joint-custody statute, joint custody is preferred in Alabama and that the trial court failed to explain why joint custody was not awarded in this case. The husband misapprehends both the scope of the joint-custody preference and the weight a trial court is required give to a child’s stated preference for custody.
*1222 An appellate court’s review of a trial court’s custody determination is limited by the ore tenus standard of review.
“ ‘ “A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong...’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ. App.1998) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981). In regard to custody determinations, this Court has also stated: ‘It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).”
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001).
“ ‘Alabama law gives neither parent priority in an initial custody determination. Ex parte Couch, 521 So.2d 987 (Ala.1988). The controlling consideration in such a case is the best interest of the child. Id. In any case in which the court makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court’s judgment based on those findings is correct, and it will reverse that judgment only if it is found to be plainly and palpably wrong. Ex parte Perkins, 646 So.2d 46 (Ala.1994). The presumption of correctness accorded the trial court’s judgment entered after the court has heard evidence presented ore tenus is especially strong in a child-custody case. Id.’ ”
Martin v. Martin, 85 So.3d 414, 419 (Ala. Civ.App.2011) (quoting Ex parte Byars, 794 So.2d 345, 347 (Ala.2001)).
The appellate courts have often explained what factors a trial court facing a question of custody should consider.
“ ‘In Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981), the Alabama Supreme Court set forth a list of factors a trial court may consider in making an initial award of custody based on the best interest of the children, including
“ ‘ “[t]he sex and age of the children ...; ... the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report and recommendation of any expert witnesses or other independent investigator; available alternatives; and any oth *1223 er relevant matter the evidence may disclose.” ’ ”
Martin, 85 So.3d at 420 (quoting Williams v. Williams, 75 So.3d 132, 139 (Ala.Civ. App.2011)). Although the stated preference of a child regarding custody is to be considered by a trial court, the child’s desires are not controlling. Terry v. Ragland, 666 So.2d 539, 541 (Ala.Civ.App. 1995); Hattrick v. Hattrick, 52 Ala.App. 539, 295 So.2d 260 (1974).
Additionally, the Alabama legislature has stated that “[i]t is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or dissolved their marriage.” Ala.Code 1975, § 30-3-150. To that end, a trial court is required to consider awarding joint custody in every case involving a child’s custody, but a trial court must award that form of custody that is in the best interest of the child. § 30-3-152; see also Cleveland v. Cleveland, 18 So.3d 950, 952-53 (Ala. Civ. App.2009). Pursuant to § 30-3-152(a), a trial court should consider the following factors when determining whether joint custody is in the best interest of the child:
“(1) The agreement or lack of agreement of the parents on joint custody.
“(2) The past and present ability of the parents to cooperate with each other and make decisions jointly.
“(3) The ability of the parents to encourage the sharing of love, affection, and contact between the child and the other parent.
“(4) Any history of or potential for child abuse, spouse abuse, or kidnapping.
“(5) The geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody.”
Although the son testified that he desired to live with the husband and said that the wife would sometimes become upset and yell and that he did not like that, the trial court was not required to accede to the son’s preference as to custody. The fact that the trial court did not award the husband custody is not proof that the trial court did not consider the son’s preference when weighing the many factors that it must consider when making a custody determination. Nor is the fact that the trial court chose not to award the parties joint custody proof that the trial court did not consider the factors set out in § 30-3-152. As the wife points out, she presented evidence indicating that the husband had expressed a desire to return to Iran to live and that he had desired to take the son with him. This evidence could have convinced the trial court that awarding the wife sole physical custody would be in the son’s best interest. We cannot conclude that the trial court erred by awarding the wife sole physical custody of the son.
The husband next argues that the trial court erred in dividing the parties’ property. He complains that the award favors the wife and is grossly inequitable. He says that the wife was awarded the Grey-stone house, all the household furnishings, $100,000 to be paid by the husband, over $200,000 in “frozen” bank accounts, two motor vehicles, and attorneys fees, which, he says, is an award of “no less than $800,000.”[2] Although we are not con *1224 vinced that the award to the wife was inequitable under the facts of this case, in light of the fact that we have reversed the trial court’s judgment on the wife’s cross-appeal so that it may readjust the property division to award the wife the value of her one-half interest in the Iranian apartments, the trial court is free on remand to adjust the equities as it sees fit based on the testimony and evidence it received at the July 2011 trial.
Finally, the husband argues that the trial court erred in determining his child-support obligation. The trial court imputed $5,000 per month in income to the husband in order to calculate his child-support obligation. The husband complains that the evidence does not support the conclusion that he has the ability to earn $5,000 per month.
“Rule 32(B)(5), Ala. R. Jud. Admin., provides, in pertinent part:
“ ‘If the court finds that either parent is voluntarily unemployed or underemployed, it shall estimate the income that parent would otherwise have and shall impute to that parent that income; the court shall calculate child support based on that parent’s imputed income. In determining the amount of income to be imputed to a parent who is unemployed or underemployed, the court should determine the employment potential and probable earning level of that parent, based on that parent’s recent work history, education, and occupational qualifications, and on the prevailing job opportunities and earning levels in the community.’
“In cases of voluntary underemployment, the amount of income to be imputed to the parent is a question of fact to be decided based on the evidence presented to the trial court. See G.B. v. J.H., [915 So.2d 570 (Ala.Civ.App.2005) ]; see also Clements v. Clements, 990 So.2d 383, 394 (Ala.Civ.App.2007) (quoting Winfrey v. Winfrey, 602 So.2d 904, 905 (Ala.Civ.App.1992)) (‘The trial court is afforded the discretion to impute income to a parent for the purpose of determining child support, and the determination that a parent is voluntarily unemployed or underemployed “is to be made from the facts presented according to the judicial discretion of the trial court.” ’). We may reverse a judgment imputing income to a voluntarily underemployed parent that is based on ore tenus evidence only if that judgment is so unsupported by the evidence as to be plainly and palpably wrong. G.B. v. J.H., 915 So.2d at 575.”
Stone v. Stone, 26 So.3d 1228, 1230-31 (Ala.Civ.App.2009) (footnote omitted).
Although we understand the trial court’s implicit decision that the husband was voluntarily unemployed, we must agree with the husband that the trial court’s decision to impute $5,000 per month in income to the husband does not appear to be supported by any evidence. In fact, based on the evidence adduced by the wife, the husband never made any large profit from his business, perhaps because he used the profit from one sale to fund the purchase of a lot for the next project. Although the husband has a bachelor’s degree in civil engineering, the testimony at trial indicated that he had never held a job using that degree. The husband is 58 years old, and *1225 he has spent the majority of his life building houses. He has not built a house since 2006, and the last house he built he could not sell. Although we agree with the trial court’s conclusion that the husband can and should seek some sort or remunerative employment, we cannot agree that the evidence reflected that the husband is able to earn $5,000 per month. We therefore reverse the trial court’s child-support award, and we remand the cause with instructions that the trial court recalculate child support based on an amount of imputed income for the husband supported by the evidence at the July 2011 trial or from new evidence concerning the husband’s present income that the parties may present on remand.

Conclusion

Based on our review of the record and the contentions of the parties on appeal, we have determined that the trial court did not err by failing to exclude certain evidence regarding the husband’s anti-American leanings or sentiments. We have further concluded that the evidence supports the award of sole physical custody of the son to the wife. However, because the wife will be unable to realize the one-half interest in the Iranian apartments awarded to her because the evidence at trial proves that the property is no longer owned by the husband, we reverse the property division so that the trial court may make adjustments to the award to provide the wife the value of that portion of the marital estate the trial court has concluded she should receive. Because the evidence does not support the conclusion that the husband is capable of earning $5,000 per month, we also reverse the trial court’s judgment insofar as it computed the husband’s child-support obligation; on remand, the trial court is to determine the amount of income to be imputed to the husband based on the evidence.
APPEAL — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CROSS-APPEAL — REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, THOMAS, MOORE, and DONALDSON, JJ., concur.

. Although the husband argues throughout his brief that the wife presented evidence indicating that he was a terrorist, the wife’s reference to terrorists was in regard to members of the mosque, whom she feared would teach the son how to be a terrorist, and was not an accusation that the husband was or is a terrorist. The record does not reflect that the wife testified that the husband was “a member of a para-military terrorist cell,” that he was a "terrorist-in-training,” or that he is "some type of terrorist soldier determined to ruin the American way of life,” and we are disappointed by the use of such hyperbole and inflammatory statements in the husband’s brief.

. Notably, the husband does not include in his argument on the property-division aspect of the trial court’s judgment any statement regarding the value of the award of the undivided one-half interest in the Iranian apartments to the wife. This is understandable if *1224 one considers the fact that the husband has submitted unchanged his brief from the original appeal, in which the trial court’s judgment awarded the wife a one-half interest in those apartments "if” they were owned by the husband. However, the trial court has since determined that the husband owned those apartments, a ruling that the husband has not challenged on appeal.